# Supreme Court of Louisiana

The Opinions handed down on the **7th day of September, 2018**, are as follows:

**BY CLARK, J.**:

2017-KK-1453     CITY OF NEW ORLEANS v. LAWRENCE CLARK (Parish of Orleans)

Defendant, Lawrence Clark, was issued a citation for displaying his art for sale on the neutral ground at Decatur Street and Esplanade Avenue in New Orleans, in violation of New Orleans Municipal Code §110 -11.  Mr. Clark moved to quash the charging affidavit, asserting the ordinance is unconstitutional.  We granted this writ application to consider whether New Orleans Municipal Code §110 -11, which regulates the outdoor retail sale of art, is unconstitutional as a violation of Mr. Clark's First Amendment rights.  For the following reasons, we find the ordinance is unconstitutional.  Therefore, we reverse the lower courts' rulings and grant the motion to quash the charging affidavit against Mr. Clark.

REVERSED; MOTION TO QUASH GRANTED

JOHNSON, C.J., dissents and assigns reasons.
HUGHES, J., dissents for the reasons assigned by Johnson, C.J.

SUPREME COURT OF LOUISIANA

No. 2017-KK-1453

CITY OF NEW ORLEANS

VERSUS

LAWRENCE CLARK

**ON SUPERVISORY WRITS TO THE CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**CLARK, Justice**

Defendant, Lawrence Clark, was issued a citation for displaying his art for sale on the neutral ground at Decatur Street and Esplanade Avenue in New Orleans, in violation of New Orleans Municipal Code §110 -11.  Mr. Clark moved to quash the charging affidavit, asserting the ordinance is unconstitutional.  We granted this writ application to consider whether New Orleans Municipal Code §110 -11, which regulates the outdoor retail sale of art, is unconstitutional as a violation of Mr. Clark's First Amendment rights.  For the following reasons, we find the ordinance is unconstitutional.  Therefore, we reverse the lower courts' rulings and grant the motion to quash the charging affidavit against Mr. Clark.

### FACTS AND PROCEDURAL HISTORY

On March 22, 2016, Mr. Clark was issued a citation as a prohibited vendor for violating Municipal Code §110 -11.  The citing officer wrote on the citation "art on display table; display on the neutral ground at Decatur & Esplanade."  Mr. Clark filed a motion to quash the charging affidavit and to declare Municipal Code §110 -11 unconstitutional, asserting it infringes upon his First Amendment right of

1

expression.[1] Following a hearing in New Orleans Municipal Court, the judge denied defendant's motion to quash. Defendant sought review from the Criminal District Court for the Parish of Orleans. The Appellate Division of Criminal District Court affirmed the ruling, finding no abuse of discretion in the municipal court's ruling. Subsequently, the court of appeal granted defendant's writ and vacated the lower courts' judgments, finding the issue of the constitutionality of the ordinance was not properly before the lower courts, because the attorney general had not been properly notified and served. *City of New Orleans v. Clark*, 16-K-0838 (La. App. 4 Cir. 9/22/16).

Following proper service on the attorney general, defendant reasserted his motion to quash, which was again denied by the municipal court judge. The Appellate Division of Criminal District Court affirmed the ruling, finding the restrictions imposed by the ordinance to be reasonable and constitutional. The court of appeal then denied defendant's writ application, finding the motion to quash "meritless." *City of New Orleans v. Clark*, 17-K-0563 (La. App. 4 Cir. 7/31/17). On defendant's application, we granted supervisory review. *City of New Orleans v. Clark*, 17-1453 (La. 12/5/17), 231 So. 3d 625.

## DISCUSSION

The New Orleans Municipal Code regulates outdoor retail sales conducted on city property. In general, Section 110-11, entitled "Prohibited street vendors," provides:

(a) It shall be unlawful for any person to engage in any retail sales or permit any displays, signs, or advertisements for retail sales outside of

---

[1] Louisiana C.Cr.P. art. 532 provides in relevant part: "A motion to quash may be based on one or more of the following grounds: (1) The indictment fails to charge an offense which is punishable under a valid statute."

2

any enclosed building within the city, unless expressly provided in another section of the Code of the City of New Orleans.

(b) Whoever violates the provisions of this section shall be punished by a fine not exceeding $500.00 or by imprisonment for not more than six months, or both such fine and imprisonment.

Pursuant to the directive of subsection (a), the Municipal Code expressly provides for the sale of art in other sections. See New Orleans, La., Municipal Code §§ 110-121 to 110-132. Specifically, through a series of ordinances, the City of New Orleans provides a permitting process that allows artists to sell their work in certain defined areas: an "A" permit allows the "permittee to paint and sell original works of art in that area defined as 'the Jackson Square setup area.'" New Orleans, La., Municipal Code § 110-121(d). The Jackson Square setup area" is defined as "a) the area extending 20 feet from the Jackson Square fence on St. Peter Street; b) the area extending 20 feet from the Jackson Square fence on Chartres Street; c) the area extending 20 feet from the Jackson Square fence on St. Ann Street; and d) the area extending five feet from the Jackson Square fence on Decatur Street." New Orleans, La., Municipal Code § 110-121(b). A "B" permit allows artists to "paint and sell works of art in that area defined as the 'vicinity of Jackson Square.'" New Orleans, La., Municipal Code § 110-121(e). "'Vicinity of Jackson Square' means Pirates Alley and that area of Royal Street bounded by Pirates Alley and Pere Antoine Alley." New Orleans, La., Municipal Code § 110-121(f). Artists holding "A" or "B" permits can also apply to the French Market Corporation "for permission to manually paint, sketch or draw on plain surfaces only" within the French Market promenades and parks. New Orleans, La., Municipal Code § 110-130. In addition to the explicit provision for "A" and "B" permits in the ordinances, the City of New Orleans also provides for an artist "C" license for the sale of art in Edison Park, located off of Bourbon Street in the French Quarter. Although "C" permits are not specifically described in the Municipal Code, the City provides for type "C" permits

3

(Edison Park) in its master application for occupations/general business license. The parties do not dispute the availability of this type of permit. The Municipal Code provides that "A" permits are limited to 200, but provides no cap for "B" or "C" permits. New Orleans, La., Municipal Code § 110-127.

Mr. Clark argues the cumulative effect of these ordinances (collectively, "the ordinance") is a blanket prohibition on the outdoor sale of art in New Orleans other than in these narrowly defined spaces in the French Quarter. He argues this sweeping ban on a core form of artistic expression violates the fundamental free speech guarantees of the First Amendment of the United States Constitution and Article I, Section 7, of the Louisiana Constitution. By contrast, the State of Louisiana and the City of New Orleans (collectively, "the City") argue the ordinance sets forth constitutional regulations on commercial speech. The City also argues the regulations are constitutionally permissible as time, place, and manner regulations on speech.

The determination of the constitutionality of a statute presents a question of law, which is reviewed by this court *de novo*. *State v. Webb*, 13-1681 (La. 5/7/14), 144 So. 3d 971, 975. "This court interprets a municipal or City ordinance using the same guidelines as those used in construing a statute. An ordinance, like a state statute, is presumed to be constitutional. Whoever attacks the constitutionality of an ordinance bears the burden of proving his allegation." *Rand v. City of New Orleans*, 17-0596 (La. 12/6/17), 235 So. 3d 1077, 1082 (internal citations removed).

The First Amendment prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., amend. I.[2] In a series of decisions beginning with *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), the Supreme Court

---

[2] Similarly, the Louisiana Constitution provides in relevant part: "No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom." La. Const. Ann. art. I, § 7.

4

has held and reaffirmed "that the liberty of speech … which the First Amendment guarantees against abridgment by the federal government is within the liberty safeguarded by the Due Process Clause of the Fourteenth Amendment from invasion by state action." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 779, 98 S.Ct. 1407, 55 L.Ed. 2d 707 (1978) (citing *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 500-01, 72 S.Ct. 777, 96 L.Ed. 1098 (1952)). The Supreme Court has further stated that the Constitution looks beyond written or spoken words as mediums of expression:

> Noting that symbolism is a primitive but effective way of communicating ideas, our cases have recognized that the First Amendment shields such acts as saluting a flag (and refusing to do so), wearing an armband to protest a war, displaying a red flag, and even marching, walking or parading in uniforms displaying the swastika. As some of these examples show, a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a "particularized message," would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll.

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed. 487 (1995) (internal quotes and citations removed). It is undisputed that the speech or expression involved in this case is protected by the First Amendment. Although the factual record is limited, based on the summons issued to Mr. Clark and the contentions of the parties, it is apparent that Mr. Clark was selling his artwork from a display table on the neutral ground at Esplanade Avenue and Decatur Street in New Orleans. "It goes without saying that artistic expression lies within this First Amendment protection." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 602, 118 S.Ct. 2168, 141 L.Ed. 2d 500 (1998).

Moreover, the fact that Mr. Clark was selling his art for profit does not change the First Amendment analysis. "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he

5

or she is paid to speak." *Riley v. National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801, 108 S.Ct. 2667, 101 L.Ed. 2d 669 (1988). Speech is protected even though it is carried in a form that is sold for profit and even though it may involve a solicitation to purchase. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761, 96 S.Ct. 1817, 48 L.Ed. 2d 346 (1976). Thus, contrary to the City's assertion, we do not find Mr. Clark's action of selling his artwork to be commercial speech. Commercial speech is defined as speech that solely proposes a commercial transaction, not speech for profit. *Bd. Of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 482, 109 S.Ct. 3028, 106 L.Ed. 2d 388 (1989); *Virginia Pharmacy Board*, 425 U.S. at 761.[3] There is nothing in the record to suggest Mr. Clark's work proposed a commercial transaction. Rather, he was selling his artwork for profit.

The application of the ordinance to Mr. Clark's expressive activity undoubtedly raises the question of whether the ordinance abridges his freedom of speech and expression within the meaning of the First Amendment. However, the fact that the ordinance presents a First Amendment issue does not necessarily mean it constitutes a First Amendment violation. See *Members of the City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808-04, 104 S.Ct. 2118, 80 L.Ed. 2d 772 (1984). The Supreme Court has explained:

> To ascertain what limits, if any, may be placed on protected speech, we have often focused on the "place" of that speech, considering the nature of the forum the speaker seeks to employ. Our cases have recognized that the standards by which limitations on speech must be evaluated differ depending on the character of the property at issue. Specifically, we have identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum.

---

[3] Designating speech as commercial or non-commercial is not necessarily outcome determinative. Even pure commercial speech is entitled to significant First Amendment protection. See *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423, 113 S.Ct. 1505, 123 L.Ed. 2d 99 (1993).

*Frisby v. Schultz*, 487 U.S. 474, 479-80, 108 S.Ct. 2495, 101 L.Ed. 2d 420 (1988) (internal citations removed). Public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are generally considered to be traditional public forums. See *United States v. Grace*, 461 U.S. 177, 103 S.Ct. 1702, 75 L.Ed. 2d 736 (1983). We recognize, and the City does not dispute, that the neutral ground where Mr. Clark was selling his artwork is a public forum for First Amendment purposes.

The government's ability to prohibit expressive activity in public forums is limited. However, it is well settled that the First Amendment does not guarantee the right to communicate one's views at all time and places or in any manner that may be desired. *Taxpayers for Vincent*, 466 U.S. at 812 (citing *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed. 2d 298 (1981)). The Supreme Court has long held that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are content neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information. See, e.g., *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed. 2d 661 (1989); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed. 2d 221 (1984); *Consolidated Edison Co., v. Public Serv. Comm'n*, 447 U.S. 530, 535-36, 100 S.Ct. 2326, 65 L.Ed. 2d 319 (1980); see also *In re Warner*, 05-1303 (La. 4/17/09), 21 So. 3d 218, 244. The City's ordinance must be examined in the context of this framework.

The first criterion for a valid time, place, and manner restriction is that the ordinance be "content neutral." This determination is essential because regulations that burden speech, but that are unrelated to the speaker's viewpoint or to the content

7

of the speech, are subject to an intermediate level of judicial scrutiny, rather than the strict level of scrutiny that is applicable to content based regulations that suppress, disadvantage, or impose differential burdens on speech because of its content. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L. Ed. 2d 497 (1994); see also, *In re Warner*, 21 So. 3d at 244. Strict scrutiny makes it less likely that a regulation will clear the constitutional hurdle because the operative test is whether a regulation "is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231, 107 S.Ct. 1722, 95 L.Ed. 2d 209 (1987). However, under intermediate scrutiny, the test is less exacting and requires only that the restriction be narrowly tailored to serve a significant governmental interest, and that it leaves open ample alternative channels for communication of the information. *Community for Creative Non-Violence*, 468 U.S. at 293.

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place or manner cases in particular, is whether the government had adopted a regulation of speech because of disagreement with the message it conveys." *Rock Against Racism*, 491 U.S. at 791 (citing *Community for Creative Non-Violence*, 468 U.S. at 295). A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. *Rock Against Racism*, 491 U.S. at 791. In this case, the ordinance regulates the outdoor locations where artists can sell their artwork. The ordinance is equally applicable to all artists, regardless of medium or message. Thus, we find the ordinance satisfies the content neutrality requirement.

To pass constitutional muster, the ordinance must also serve a significant governmental interest. The City asserts an interest in preserving the "*tout ensemble*" of the French Quarter and advancing its substantial economic interest by promoting

8

tourism, and an interest in keeping its streets and neutral grounds open and available for movement in a manner that advances public safety. We accept that the City has stated a legitimate and significant interest in preserving the distinct charm, character, and economic vitality of the French Quarter. In enacting the ordinance, the New Orleans City Council recognized the Supreme Court's decision in *City of New Orleans v. Dukes*, which noted "[t]he Vieux Carre of the city of New Orleans is the heart of [the] city's considerable tourist industry and an integral component of the city's economy." 427 U.S. 297, 299, 96 S.Ct. 2513, 49 L.Ed. 2d 511 (La. 1976).[4] The regulation of sales of merchandise on city property within city limits is part of a city's traditional municipal police powers, and the City has a legitimate interest in controlling commerce on city streets and other public property.[5] The City has made the considered decision to promote its economy by driving outdoor art sales to the heart of the City's tourism industry – the French Quarter − thereby "enhancing the vital role of the French Quarter's tourist-oriented charm in the economy of New Orleans." See id. at 303. We find that decision advances the City's significant economic and cultural preservation interests. See also, *One World Family Now v. City of Miami Beach*, 175 F.3d 1282, 1288 (11th Cir. 1999) ("There is also no question that the city's further interest in creating an aesthetic ambiance which will attract tourists to the historic Art Deco district – which it considers 'the economic lifeblood of the city' − is a substantial government interest.…"). The Supreme Court has recognized that the government may exercise its police powers to advance esthetic values, reasoning the "concept of public welfare is broad and inclusive. The

---

[4] See City of New Orleans Ordinance Documents, No. 21787 M.C.S., 10/28/04.

[5] Police power is the power of a governmental body to impose laws and regulations that are reasonably related to the protection or promotion of a public good such as health, safety or welfare. *Louisiana Associated Gen. Contractors, Inc. v. Calcasieu Par. Sch. Bd.*, 586 So. 2d 1354, 1367 n.20 (La. 1991).

values it represents are spiritual as well as physical, aesthetic as well as monetary." *Taxpayers for Vincent*, 466 U.S. at 805 (internal citations removed). Further, there is no question that "[g]overnmental authorities have the duty and responsibility to keep their streets open and available for movement." *Cox v. Louisiana*, 379 U.S. 536, 554-55, 85 S.Ct. 453, 13 L.Ed 2d 471 (1965). The neutral grounds between the streets should be treated no differently. We find the City has the right to regulate the use of its streets, neutral grounds, and other facilities to assure the safety and convenience of the people in their use of the property. See *Heffron*, 452 U.S. at 650.

In addition to serving a significant governmental interest, the ordinance must be narrowly tailored to serve that interest. The means chosen by the City to achieve the desired end need not be the least intrusive or least restrictive means of doing so. *Rock Against Racism*, 491 U.S. at 798. The Supreme Court has clearly held that "restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" Id. at 797 (citing *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed. 2d 536 (1985)). Allowing some forms of expression, while denying others, does not signify a violation of the First Amendment. See *U.S. v. Kokinda*, 497 U.S. 720, 734 110 S.Ct. 3115, 111 L.Ed. 2d 571 (1990) (wherein the Court found the activity of solicitation could be signaled out and prohibited because of the disruption it caused). The sale of art in outdoor public spaces invites patrons not only to observe the artwork, but also to stop for longer periods of time to conduct a sales transaction. See, e.g., *Heffron*, 452 U.S. at 653 (wherein the Court recognized a distinction between the purely communicative aspect of oral advocacy and the solicitation of contributions, which may be more disruptive on order and crowd flow). As the Court explained in *Kokinda*:

> Solicitation impedes the normal flow of traffic. Solicitation requires action by those who would respond: The individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card. As residents of metropolitan areas know from daily experience, confrontation by a person asking for money disrupts passage and is more intrusive and intimidating than an encounter with a person giving out information. One need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand, but one must listen, comprehend, decide, and act in order to respond to a solicitation. Solicitors can achieve their goal only by "stopping [passersby] momentarily or for longer periods as money is given or exchanged for literature" or other items.

497 U.S. at 733-34 (internal citations removed). The outdoor sale of art raises the same concerns. Notably the ordinance does not purport to regulate display of art, or other forms of communication. The act of displaying art does not require action by anyone, whereas the sale of art requires action – someone stopping to make a transaction. Art purchases are more time-consuming and more absorbing than observing a display and moving on. Limiting outdoor sale of art to designated areas of the city and prohibiting general retail sale of art on sidewalks and neutral grounds allows drivers to have clear visuals of the roads and pedestrians without distractions and delays, and allows for the free flow of pedestrian and vehicular traffic within the city.

The City maintains that absent the ordinance, unlimited artists could set up shop and conduct retail sales on the neutral grounds, sidewalks, or other public areas throughout the city. Unquestionably, crowds of artists selling their work would affect the City's ability to control public safety and regulate sales on its property. See, e.g., *Community for Creative Non-Violence*, 468 U.S. at 296-97; *Heffron*, 452 U.S. at 652-53. While the ordinance does impose some burden on speech, the ordinance does not prohibit all speech on public property, including the neutral ground chosen by Mr. Clark. The City asserts that restricting outdoor sales of art to

11

its highest tourism area serves its significant governmental interests of public safety and economic benefit, and, without the regulation, it could not effectively accomplish its goals.

Mr. Clark concedes that the City has a valid interest in regulating the conduct of art vendors and that narrowly tailored regulations that ensure safety of drivers and pedestrians comport with the First Amendment. However, he argues, the City has taken no measures to tailor its regulation of the sale of art in public places such as the neutral ground to avoid impermissibly burdening protected speech. Rather, the City has completely banned the sale of art in every public space in New Orleans save the Jackson Square area and Edison Park in the French Quarter.

The decision in *ACORN v. City of New Orleans*, 600 F.Supp. 16 (E.D.La. 1984), provides guidance on permissible regulations on speech in the neutral ground and other public fora. In *ACORN*, a non-profit organization challenged a New Orleans city ordinance that prohibited persons from standing in a roadway or on the neutral ground for the purpose of soliciting funds. The court found the total ban on soliciting funds in roadways or on neutral grounds to be an unconstitutional restriction of expression and enjoined its enforcement. The court held that while the City had a valid interest in promoting safety and convenience by enacting time, place, and manner restrictions on expressive activity on the neutral ground, a complete ban was overbroad. Id. at 22. Specifically, the court found the City had not taken into account factors such as "the part of town, the number of cars passing, the speed of traffic, the width of the neutral grounds, the presence of a stop sign or traffic signal, or the color of the light … the number of solicitors, their visibility, the size of their signs, the time of day or the day of the week." Id.

The record before us indicates the City has taken no measures to tailor its regulation of the sale of art in public places to avoid impermissibly burdening

12

protected speech. In fact, Municipal Code § 110-11 is not even limited to areas next to roadways or solicitation of motorists. Rather, it extends to all outdoor sales to all individuals, including pedestrians. The City could have made "an earnest attempt to accommodate legitimate speech interests through careful drafting" by adopting "less restrictive methods" to ensure public safety – for example, by regulating the distance between an artist and the roadway or by prohibiting artists from distracting behavior. See ACORN, 606 F. Supp. at 24. We find neither of the purported interests identified by the City – public safety and economic benefit – justify the significant burden on speech created by Municipal Code § 110-11. Both of these interests can be achieved by far less restrictive means than the ordinance's citywide prohibition on outdoor sales of art, save the Jackson Square area and Edison Park in the French Quarter. Thus, we conclude the ordinance is overly broad and not narrowly tailored to serve the City's substantial interests.

Furthermore, we find the ordinance does not allow ample alternative channels for artists to communicate their message. The City's ordinance offers no alternative geographic channel for selling art; such sales are completely banned outside the French Quarter.

The guarantee of the right to expression under the Louisiana Constitution must be at least equal – if not greater – to that of the First Amendment. See State v. Franzone, 384 So. 2d 409, 411 (La. 1980). However, owing to a ban on artistic expression that is geographically broad in scope, there is no ample alternative channel for artistic expression. Community for Creative Non-Violence, 468 U.S. at 293. In a city with allegiances to neighborhoods spanning generations, the people who populate Central City, the Garden District, the Irish Channel, Broadmoor, Hollygrove, Gert Town, Mid-City, Treme, City Park, Lakeview, Gentilly Woods, Faubourg Marigny, St. Roch, the Lower Ninth Ward, Little Woods, Village de L'est,

13

Lake Catherine, Algiers Point and English Turn, among other neighborhoods, have limitations imposed on their constitutionally-protected artistic expression. Thus, we find the City's ordinance violates the First Amendment, and the lower courts erred by holding otherwise.

## DECREE

Accordingly, we hold New Orleans Municipal Code §110-11 is unconstitutional. We reverse the lower courts' rulings and grant the motion to quash the charging affidavit against Mr. Clark.

**REVERSED; MOTION TO QUASH GRANTED**

SUPREME COURT OF LOUISIANA

No. 2017-KK-1453

CITY OF NEW ORLEANS

VERSUS

LAWRENCE CLARK

ON SUPERVISORY WRITS TO THE CRIMINAL DISTRICT
COURT FOR THE PARISH OF ORLEANS

**JOHNSON, Chief Justice, dissents and assigns reasons.**

I respectfully dissent because I find Municipal Code §110-11, which regulates the outdoor retail sale of art in New Orleans, is constitutional and does not violate Mr. Clark's First Amendment rights.

In this case, Mr. Clark was conducting a retail sale of his artwork on public property without a permit. There is no question that Mr. Clark's conduct is subject to reasonable time, place, or manner restrictions by the City. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065, 3069, 82 L. Ed. 2d 221 (1984). As recognized by the majority, the City's ordinance is subject to an intermediate level of judicial scrutiny and only requires that the restriction be narrowly tailored to serve a significant governmental interest, and that it leaves open ample alternative channels for communication of the information. *See id.* In this case, I find the ordinance passes constitutional muster.

The Ninth Circuit's decision *in One World One Family Now v. City & Cty. of Honolulu*, 76 F.3d 1009 (9th Cir. 1996) is particularly instructive because it concerns a city ordinance regulating sales in public places. In that case, plaintiffs, nonprofit organizations that sold T-shirts imprinted with various philosophical and inspirational

1

messages, challenged a Honolulu ordinance which banned the sale of all "goods, wares, merchandise, foodstuffs, refreshments or other kinds of property or services ... upon the public streets, alleys, sidewalks, malls, parks, beaches and other public places in Waikiki." *One World One Family Now*, 76 F.3d at 1011. Plaintiffs argued their *selling* was constitutionally protected expression and the ordinance could not be applied to them. The court agreed that plaintiffs' conduct was protected by the First Amendment. Relying on its earlier decision in *Gaudiya Vaishnava Soc'y v. City and County of San Francisco*, 952 F.2d 1059 (9th Cir.1990), *cert. denied*, 504 U.S. 914, 112 S.Ct. 1951, 118 L.Ed. 2d 555 (1992), the court explained "that, when the sale of merchandise bearing political, religious, philosophical or ideological messages is 'inextricably intertwined' with other forms of protected expression (like distributing literature and proselytizing), the First Amendment applies." *Id.* at 1012. However, the court went on to hold the Honolulu ordinance was a valid time, place and manner restriction and could be applied to prohibit plaintiffs' selling of their merchandise.

The Ninth Circuit recognized that cities have a substantial interest in protecting the aesthetic appearance of their communities by avoiding visual clutter and a substantial interest in assuring safe and convenient circulation on their streets. *Id*. at 1013. The court further found that Honolulu demonstrated a substantial interest in protecting local merchants from unfair competition. *Id*. The court held that the ordinance was narrowly tailored to serve these interests because they would be achieved less effectively absent the regulation. *Id*. The court noted:

> Without the ordinance, sidewalk vendors (commercial and charitable alike) would be free to peddle their wares on [the streets] undermining the city's efforts to provide a pleasant strolling and shopping area. A proliferation of sidewalk vendors could also aggravate the congestion on already crowded sidewalks and siphon off sales from local merchants. Because the peddling ordinance addresses these problems without ... significantly restricting a substantial quantity of speech that does not create the same evils, [the ordinance] is narrowly tailored.

*Id.* at 1014. The court further rejected plaintiffs' argument that Honolulu could adopt less restrictive alternatives to advance its interests, such as limiting the number of vendors, their hours of operation or the size and location of their stands. *Id.* The court explained a "reasonable time, place and manner regulation, however, need not be the least restrictive or least intrusive alternative. So long as the means chosen are not substantially broader than necessary to achieve the government's interest, ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. *Id.* (Internal citations removed). The court held that "Honolulu's peddling ordinance isn't substantially broader than necessary to achieve its interests. The ordinance targets precisely the activity—sidewalk vending—causing the problems the city legitimately seeks to ameliorate, and it doesn't sweep in expressive activity that doesn't contribute to those problems." *Id.* (Internal quotations and citations removed).

The Ninth Circuit further found that the ordinance left open ample alternative channels of communication, explaining:

> The ordinance forecloses one narrow form of expression—sidewalk sales of message-bearing merchandise—and leaves the plaintiffs free to disseminate and seek financial support for their views through "myriad and diverse" alternative channels, such as handing out literature, proselytizing or soliciting donations. In addition, plaintiffs' volunteers may hand out free T-shirts to passers-by, or mingle with Waikiki's tourist throngs wearing T-shirts (thereby acting as human billboards). Plaintiffs may also sell T-shirts through local retail outlets or by opening their own stores, so long as they comply with the regulations generally applicable to merchants.

*Id.* (Internal quotations and citations removed).

As in *One World One Family Now*, the ordinance at issue seeks to regulate retail sales on city property. And, as that court concluded, I find the ordinance in this case is narrowly tailored to serve the City's interests. Mr. Clark was conducting a commercial transaction on city property by selling his artwork on the neutral ground.

3

The majority recognizes the City's substantial interest in preserving the distinct charm, character, and economic vitality of the French Quarter. The majority further recognizes the City's interest in controlling commerce within the city limits, and a duty to assure the safety and convenience of the people in their use of the City's property. The ordinance solely regulates *sale* of art on public property. The ordinance does not prohibit all speech on public property. Although the majority gives passing mention to the potential disruption on order and crowd flow caused by the sale of art in outdoor public spaces, the majority fails to fully recognize and distinguish the effect of such conduct from other forms of expression, such as pure oral advocacy. In my view, there are real differences between distribution of information and sales, as conducting a sale on public property undoubtedly presents greater crowd control problems. As in *One World One Family Now*, I find the ordinance in this case is not broader than necessary to achieve the City's interests. Without the ordinance, anyone would be free to sell their artwork anywhere in the city, undermining the city's efforts to maintain the character and economic vitality of the French Quarter. A swarm of art sellers on city streets would also increase congestion and impede pedestrian and traffic flow, creating public safety concerns. Further, it is my opinion that a city, by regulation, can protect local merchants who incur substantial costs to sell artwork in the city by controlling and governing outdoor vendors of art who necessarily siphon off some of the sales from these local merchants. Thus, even if there are other ways to accomplish the City's goals, I do not find this ordinance substantially burdens more speech than necessary. The City is entitled to make a judgment that restricting outdoor sales of artwork to its highest tourism area serves the City's significant governmental interests of public safety and economic benefit. The ordinance targets the problems the city legitimately seeks to control, and does not sweep in other expressive activity that does not contribute to those problems.

4

Likewise, I do not find the majority's reliance on the 1984 federal district court's decision in *ACORN v. City of New Orleans* persuasive. In *ACORN*, the plaintiff challenged a city ordinance which prohibited persons from standing in a roadway or on a neutral ground for the purpose of soliciting funds. Unlike this case which deals strictly Mr. Clark's retail sale, ACORN is a non-profit association of low and moderate income people with the purpose of advancing the interests of its membership in areas of social and political concern such as utility rates, hazardous materials and park facilities. One of its methods of information dissemination and fundraising involves distributing information and soliciting funds at roadway intersections. 606 F.Supp. at 18. ACORN argued the ordinance violated the rights of its solicitors because it was overbroad and the City could accomplish its goals by less intrusive means. *Id.* at 20. The court agreed and found the city's ordinance fell short of being a reasonable time, place and manner regulation, reasoning that "for an ordinance to pass constitutional muster as a time, place and manner regulation, the government has the burden of showing that it has **employed the means least restrictive** of protected First Amendment activity." *Id*. at 23 (emphasis added). However, the United States Supreme Court has subsequently made clear that "this less-restrictive-alternative analysis ... has never been a part of the inquiry into the validity of a time, place, and manner regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 797, 109 S.Ct. 2746, 105 L.Ed. 2d 661 (1989) (internal quotations and citations removed). The Supreme Court specifically held that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it **need not be the least restrictive or least intrusive means of doing so.** Rather, the requirement of narrow tailoring is satisfied so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Rock Against*

5

*Racism*, 491 U.S. at 798-99 (emphasis added) (internal quotations and citations removed).

Additionally, unlike the majority, I find the ordinance allows ample alternative channels for artists to communicate their message. An alternative forum does not have to be the speaker's first choice. The First Amendment requires only that the government refrain from denying a reasonable opportunity for communication. In *Members of the City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed. 2d 772 (1984), a political candidate challenged the constitutionality of an ordinance which prohibited the posting of signs of public property. In upholding the ban, the Supreme Court found the ordinance allowed for adequate alternative modes of communication:

> The Los Angeles ordinance does not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited. To the extent that the posting of signs on public property has advantages over these forms of expression, there is no reason to believe that these same advantages cannot be obtained through other means. To the contrary, the findings of the District Court indicate that there are ample alternative modes of communication in Los Angeles. Notwithstanding appellees' general assertions in their brief concerning the utility of political posters, nothing in the findings indicates that the posting of political posters on public property is a uniquely valuable or important mode of communication, or that appellees' ability to communicate effectively is threatened by ever-increasing restrictions on expression.

466 U.S. at 812 (internal citations removed). In this case, although the ordinance limits the number of outdoor places in the city where artists can sell their art, thus curtailing Mr. Clark's opportunity to communicate in that specific manner, this is a necessary side effect of almost any restriction on speech. The proper focus is not on whether a degree of curtailment exists, but rather on whether the remaining avenues are adequate. Contrary to Mr. Clark's assertions, I do not find the ordinance acts as a sweeping ban on the outdoor sale of artwork in the city. The ordinance does not proscribe the retail sale of art altogether, but simply regulates and designates the

6

permissible locations for such activity. The ordinance does not apply to retail sales of art in indoor spaces, nor does the ordinance impose restrictions on other forms of communication and expressive activity, such as display of artwork. The ordinance permits a general dissemination of a message. The limited nature of the prohibition makes it self-evident that ample alternatives remain. The ordinance does not prevent an artist from displaying his artwork in the same place where the sale of artwork may be prohibited. Notably, the ordinance would not have prevented Mr. Clark from displaying his artwork or distributing fliers about his artwork on the same neutral ground.

For these reasons, I would affirm the rulings of the lower courts and find the ordinance sets forth constitutionally permissible time, place and manner restrictions on the sale of art on public property.

SUPREME COURT OF LOUISIANA

No. 2017-KK-1453

CITY OF NEW ORLEANS

VERSUS

LAWRENCE CLARK

ON SUPERVISORY WRITS TO THE CRIMINAL DISTRICT
COURT FOR THE PARISH OF ORLEANS


**Hughes, J., dissents for the reasons assigned by Chief Justice Johnson.**