KAREN COHEN KINNETT

VERSUS

JARRED BRANDON KINNETT

NO. 17-CA-625

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON REMAND FROM LOUISIANA SUPREME COURT PARISH OF JEFFERSON,
STATE OF LOUISIANA NO. 768-195, DIVISION "E"
HONORABLE WILLIAM H. CREDO, JUDGE  PRO TEMPORE PRESIDING

December 28, 2022

**FREDERICKA HOMBERGWICKER**

**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Robert A. Chaisson

<u>**REVERSED;REMANDED**</u>
   **FHW**
   **JGG**
   **RAC**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Alexis Barteet
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
KAREN COHEN KINNETT
 Allison K. Nestor
 Leonard L. Levenson

COUNSEL FOR DEFENDANT/APPELLEE,
JARRED BRANDON KINNETT
 Jacqueline F. Maloney
 Tracy G. Sheppard

COUNSEL FOR INTERVENOR/APPELLANT,
KEITH EDWARD ANDREWS
 Thomas A. Robichaux
 Stephanie A. Fratello
 Sharon L. Andrews
 Desiree M. Valenti

COUNSEL FOR MINOR/APPELLEE,
G. J. K., MINOR CHILD
 Ramona G. Fernandez
 and Tobie L. Tranchina, Supervising Attorneys
 Loyola University New Orleans, College of Law
 Victoria Barczyk, Student Practitioner
 Sarah Skidmore, Student Practitioner
 Olivia Holm, Student Practitioner
 Cynthia Traina, Student Practitioner

COUNSEL FOR AMICUS CURIAE,
STATE OF LOUISIANA, DEPARTMENT OF JUSTICE
 Honorable Jeffrey M. Landry
 David J. Smith, Jr.
 Jeffrey M. Wale
 Chimene St. Amant

**WICKER, J.**

This matter is before this Court following a remand from the Louisiana Supreme Court. The sole issue presented to this Court is the constitutionality of Louisiana Civil Code Article 198, which controls a biological father's avowal action to his biological child and limits that biological father's action to a one-year peremptive period when that child is born during a marriage between the biological mother and the presumed legal father. Upon review, we first find that the biological father in this case has a vested right or liberty interest to parent his biological child, established through his biological link in addition to evidence presented to prove that he "grasped the opportunity" to parent and established a relationship with the minor child when given the opportunity. We further find that Article 198 as applied in this case unconstitutionally limits the biological father's vested right to parent his child and deprives the biological father of his due process rights under the Louisiana Constitution. For these reasons, we hold that Article 198 is unconstitutional as applied to the biological father in this case. We therefore reverse the January 10, 2019 judgment appealed from and remand this matter for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND:**

The underlying facts and procedural history in this matter have been previously set forth by this Court:

> Ms. Kinnett commenced the instant litigation by filing for divorce on January 14, 2017. She sought joint custody with Mr. Kinnett of their daughter, B.A.K., but sole custody of her son, G.J.K. On January 27, 2017, Mr. Kinnett filed his Answer and Reconventional Demand disputing Ms. Kinnett's contention that awarding her sole custody of G.J.K. would be in the child's best interest, urging instead that joint custody be granted.

> On February 10, 2017, Mr. Andrews filed a Petition in Intervention to Establish Paternity and to Obtain Custody of G.J.K. In his petition, Mr. Andrews alleged that Ms. Kinnett had concealed his possible paternity until December 9, 2016, and sought an order establishing paternity and an action to obtain custody.

On February 21, 2017, Mr. Kinnett answered Mr. Andrews' intervention with Exceptions of No Cause and/or No Right of Action, Prescription, and Peremption, arguing that Mr. Andrews' avowal action was peremped under Louisiana Civil Code art. 198 because he failed to file an action within one year of G.J.K.'s birth. On February 24, 2017, the court appointed the Loyola Law Clinic to represent the interests of the minor child. Ms. Kinnett first filed a memorandum opposing the exceptions on April 10, 2017, however, on May 31, 2017, she filed a second memorandum supporting the exceptions. On appeal, Ms. Kinnett adopted the arguments in Mr. Kinnett's appellee briefs.

At the initial April 12, 2017 hearing, the Domestic Commissioner denied the exceptions of no right of action and no cause of action as to paternity, and granted the exception of no cause of action as to custody. He also granted the exception of peremption, finding that Mr. Andrews should have known G.J.K. was his child given that he had "intimate contact" with Ms. Kinnett nine months prior to the child's birth. Mr. Andrews objected to the Commissioner's ruling, contending in pertinent part that the "time limitations in Civil Code article 198 are constitutionally invalid."

The parties tried the exceptions de novo before the district court on June 2, 2017. The district court judge ruled from the bench denying the exceptions of no cause of action and no right of action as to paternity, but granting the exceptions of no cause of action and no right of action as to custody and visitation.[1] The judge further held that Mr. Andrews' avowal action was preempted [sic] under Article 198 based on his finding that (a) Mr. Andrews had not proven "that the mother was actually in bad faith and intended to deceive," and (b) he had filed his avowal action more than a year from the time the judge determined he knew or should have known that he was G.J.K.'s father.[2] The trial court declined to rule on the constitutionality of the statute and denied Mr. Andrews' motion for additional time to notify the attorney general and further plead the constitutionality issue. Mr. Andrews appealed the June 2, 2017 judgment to this Court.

On March 23, 2018, this Court stayed this appeal and remanded the case to the trial court to allow Mr. Andrews the opportunity to amend his petition and appropriately challenge the constitutionality

---

[1] We point out, in this opinion, that no party sought supervisory or appellate review of the granting of the exception as to visitation, which is an interlocutory judgment. Visitation matters are "always open to change when the conditions warrant it." *See Becnel v. Becnel*, 98-593 (La. App. 5 Cir. 3/25/99), 732 So.2d 589, 592, *writ denied,* 99-1165 (La. 6/4/99), 744 So.2d 630; *Gaskin v. Henry*, 36,714 (La. App. 2 Cir. 10/23/02), 830 So.2d 471, 476.

[2] We point out, in this opinion, that the language of Article 198 does not call for any factual finding considering whether the biological father "knew or should have known" of his paternity until there is *first* a finding that the mother in "bad faith deceived" the biological father. The language in Article 198 provides that "if the mother in bad faith deceived the father of the child regarding his paternity, the action shall be instituted within one year from the day the father knew or should have known of his paternity." A simple statutory construction analysis of the "if…, then" language structure set forth in Article 198 demonstrates that consideration of the biological father's knowledge is not relevant for consideration or analysis by the courts *until* there is *first* a finding that the mother in bad faith deceived the biological father. Thus, any factual finding by the trial court concerning possible constructive knowledge of paternity is irrelevant to our analysis in this case when considering the fundamental constitutional right to parent as it applies to the constitutionality of Article 198.

of Article 198. *Kinnett v. Kinnett*, 17-CA-625, per curiam, p. 4. On April 6, 2018, Mr. Andrews filed his First Supplemental and Amending Petition, formally challenging Article 198's constitutionality, thereafter notifying the Louisiana Attorney General as required by law. The Law Clinic filed a memorandum in support of Mr. Andrews' Supplemental and Amending Petition on June 4, 2018.

*Kinnett v. Kinnett*, 17-625 (La. App. 5 Cir. 8/6/20), 302 So.3d 157, 165, *writ granted*, 20-01134 (La. 2/9/21), 309 So.3d 735, *reh'g denied*, 20-01134 (La. 1/28/22) —— So.3d ——, 2022 WL 262973, and *writ granted*, 20-01143 (La. 2/9/21), 309 So.3d 735, *reh'g denied*, 20-01143 (La. 1/28/22) —— So.3d —— –, 2022 WL 262971, and *writ granted*, 20-01156 (La. 2/9/21), 309 So.3d 738, *reh'g denied*, 20-01156 (La. 1/28/22) —— So.3d ——, 2022 WL 263066, and *rev'd in part*, 20-01134 (La. 12/10/21), 332 So.3d 1149.

On remand, in his supplemental petition, Mr. Andrews set forth factual allegations to demonstrate that he had "immediately assumed the role of G.J.K.'s biological father and began taking steps to support...and become involved in G.J.K.'s life." Subsequently:

> On May 15, 2018, Mr. Kinnett moved to strike the portions of Mr. Andrews' supplemental petition in which he alleged that he had provided financial support and started spending time with G.J.K., on the grounds that whether the biological father had established a relationship with the child was not relevant to the question of constitutionality.

> *        *        *

> On June 13, 2018, the trial court, Hon. John Molaison presiding, conducted a hearing on the motions in limine and motions to strike. At the June 13, 2018 hearing, Judge Molaison correctly pointed out that the constitutionality challenge presented in Mr. Andrews' supplemental petition is in fact an ordinary proceeding. Judge Molaison thus found discovery was proper and stated, "it's an ordinary proceeding and I cannot bar someone from attempting to introduce evidence to support that constitutional challenge to a statute" and "I believe the law allows the introduction of evidence to support a challenge to the constitutionality of the statute." On July 18, 2018, Judge Molaison issued a written judgment denying Mr. Kinnett's motion to strike the allegations stated in the amended petition as well as the motion to strike any fact witnesses. He also denied the motions to strike discovery and fact witnesses, having found that "fact discovery" was appropriate and stated "I think I have to reset this hearing, allow you folks to conduct your discovery, determine if you need any additional witnesses on your own, and then we set it for trial."

> *        *        *

On October 1, 2018, after a new trial judge had been appointed to preside over the case, Ms. Kinnett filed a "Motion In Limine to Exclude Testimony and Evidence of Any Fact Witness," seeking "an order prohibiting Intervenor from calling any fact witnesses at trial" on the constitutionality issue. This motion was nearly identical in substance to the motion in limine previously filed by Mr. Kinnett and denied by Judge Molaison. In her motion, Ms. Kinnett asserted that "testimony as to what relationship Intervenor may or may not have had with the minor and what action he may or may not have taken with respect to parenting the minor, does not make the constitutionality of Art. 198, more or less likely."

\*　　\*　　\*

Prior to the hearing on the second motion in limine, the third judge to preside over this case was appointed pro tempore, the Hon. William Credo, III.

\*　　\*　　\*

By judgment dated October 23, 2018, Judge Credo granted the "Motion in Limine to Exclude Testimony and Evidence of Any Fact Witnesses," precluding any factual evidence from being introduced at the trial on the issue of constitutionality. Further, while Judge Credo recognized the possibility that "constitutional scholars, legislators, or those who possess highly specialized knowledge of the legislative history of the law in question" might serve as witnesses, the court found that neither the opinion of Mr. Andrews' expert, Dr. Sonnier, nor the testimony of Mr. Andrews or any other fact witness was related to "whether the statute serves a legitimate government purpose of protecting the status of a child vis-á-vis his mother and father, his family, his classmates, and the world."

On November 5 and December 18, 2018, Judge Credo presiding, the trial court heard and considered only oral arguments as to Mr. Andrews' constitutionality challenge raised in his supplemental petition. On January 10, 2019, the court issued its written judgment, holding "that La. Civ. Code art. 198 is constitutional. Keith Edward Andrews has failed to submit evidence that Article 198 violates either substantive or procedural rights to due process or that it fails to protect a fundamental liberty interest, as alleged in his First Supplemental and Amending Petition."

Mr. Andrews filed a devolutive appeal. On appeal, Mr. Andrews complained of three trial court rulings: the trial court's June 2, 2017 judgment holding that his avowal action was perempted; the October 23, 2018 interlocutory judgment granting the motion *in limine* to exclude "any fact witness" in connection with the trial of his constitutionality challenge raised in his supplemental petition; and the January 10, 2019 judgment holding that La. C.C. art. 198 is constitutional.

\*    \*    \*

This Court issued an opinion, reversing the trial court judgment on the issue of peremption. Finding legal error that interdicted the fact-finding process, this Court conducted a *de novo* review and found that Ms. Kinnett in bad faith deceived Mr. Andrews regarding his paternity, observing: "there is no set of circumstances wherein a woman–who has had sexual relations with more than one man during the period of possible conception–may have an 'honest belief' that one man, and not the other, is the father." *Kinnett v. Kinnett*, 332 So.3d at 1152, citing *Kinnett v. Kinnett*, 302 So.3d at 177.

*Kinnett v. Kinnett*, 17-625 (La. App. 5 Cir. 7/7/22), 345 So.3d 1122, 1125, *writ granted, judgment vacated and set aside,* 22-01246 (La. 9/20/22), 345 So.3d 1020, and *writ granted, judgment vacated and set aside,* 22-01199 (La. 9/20/22), 345 So.3d 1021.

The Louisiana Supreme Court subsequently granted writs, and reversed this Court's opinion, finding that "the trial court's findings were not manifestly in error or clearly wrong." *Kinnett*, 332 So.3d 1149, 1157. In reversing this Court's opinion, the Louisiana Supreme Court found that "a mother who knows another man is possibly the father of her child" is not in bad faith in failing to disclose that knowledge of possible paternity to a biological father after the child's birth if a trial judge finds credible the mother's belief that one man, rather than the other— both of whom she had sexual relations within a single (typically one-week) conception period— is the father. Thus, the Louisiana Supreme Court found that a woman does not have a duty at any time after the birth of a child to either investigate and conduct testing to determine the child's paternity or to provide the other man, with whom she had sexual relations during the conception period, an opportunity through her disclosure to discover his possible paternity.

Having reversed this Court on the peremption of Mr. Andrews' avowal claim, the Louisiana Supreme Court remanded the matter to this Court for "consideration of Mr. Andrews' constitutional challenge." *Kinnett*, 332 So.3d at 1157. In its decision, the Louisiana Supreme Court clearly instructed that the minor child "G.J.K. lacks standing to challenge the constitutionality of Article 198" and

further instructed that, in considering a constitutional analysis, "a party must complain of a constitutional defect in the application of the statute to him or herself, not of a defect in its application to third parties in hypothetical situations." *Kinnett v. Kinnett*, 20-01134 (La. 10/10/21), 332 So.3d 1149, 1157.

After remand—and in reviewing the interlocutory judgment on the motion *in limine* set forth previously as an assignment of error in connection with the appeal but not previously considered by this Court as unnecessary in light of our finding that Mr. Andrews' claim was not preempted—this Court found that the trial court erred in granting the motion *in limine* to exclude any fact witness and to prohibit any fact discovery relating to the constitutional issue. This Court found that any party challenging the constitutionality of a statute "has the burden of introducing evidence of his entitlement to bring a declaratory judgment action, *i.e.*, his standing to bring suit." *Kinnett v. Kinnett*, 17-625 (La. App. 5 Cir. 7/7/22), 345 So.3d 1122, 1130, *writ granted, judgment vacated and set aside,* 22-01246 (La. 9/20/22), 345 So.3d 1020, and *writ granted, judgment vacated and set aside,* 22-01199 (La. 9/20/22), 345 So.3d 1021, citing *In re Melancon*, 05-1702 (La. 7/10/06), 935 So.2d 661, 667. We further found that the trial judge's rulings "affected the presentation of evidence, or lack thereof, permitted at trial" and we vacated the judgments appealed and remanded the matter to the trial court to allow the parties to conduct proper discovery relating to Mr. Andrews' supplemental petition raising the issue of Article 198's constitutionality. *Id.*

The Louisiana Supreme Court again granted writs in this matter and vacated this Court's judgment, remanding the matter to this Court for consideration of the constitutionality of La. C.C. art. 198. In a *per curiam* opinion, the Court stated, "[i]t is well settled that the determination of whether a statute is constitutional presents a question of law, which is reviewed on a *de novo* basis. *Westlawn Cemeteries, L.L.C. v. Louisiana Cemetery Bd.*, 2021-01414 (La. 3/25/22), 339

So.3d 548, 559; *City of New Orleans v. Clark*, 2017-1453 (La. 9/7/18), 251 So. 3d 1047, 1051; *State v. Webb*, 2013-1681 (La. 5/7/14), 144 So.3d 971, 975. There is sufficient evidence in the record, including the proffered evidence, for the court of appeal to review the district court's judgment finding La. Civ. Code art. 198 to be constitutional." *Kinnett*, *supra*.

On remand, we now consider, as instructed, only Mr. Andrew's challenge on appeal to the constitutionality of Article 198. For the reasons set forth below, we find Article 198 to be unconstitutional as applied to Mr. Andrews in this case and we remand this matter to the trial court for further proceedings on Mr. Andrews' Petition of Intervention.

**DISCUSSION**

On appeal, both Mr. Andrews and the minor child, G.J.K, complain of the trial court's January 10, 2019 judgment upholding the constitutionality of Article 198. G.J.K. argues that the article is unconstitutional under the due process clause because it violates G.J.K.'s constitutional right to prevent the erroneous termination of the natural relationship between G.J.K. and his biological father without adequate notice or other safeguards in place. Further, G.J.K. contends that the article violates the equal protection clause because it discriminates on the basis of birth. Mr. Andrews contends that the article violates the due process clause of the federal and state constitutions because it effectively terminates a biological parent's fundamental and constitutional right to parent without notice or a meaningful opportunity to be heard. He further asserts that it violates the equal protection clause because it results in a disparity in the standards of knowledge and duty between a biological father and a biological mother.

We begin our analysis by reviewing the language of the article itself. La. C.C. art. 198 provides:

A man may institute an action to establish his paternity of a child at any time except as provided in this Article. The action is strictly personal.

If the child is presumed to be the child of another man, the action shall be instituted within one year from the day of the birth of the child. Nevertheless, if the mother in bad faith deceived the father of the child regarding his paternity, the action shall be instituted within one year from the day the father knew or should have known of his paternity, or within ten years from the day of the birth of the child, whichever first occurs.

In all cases, the action shall be instituted no later than one year from the day of the death of the child.

The time periods in this Article are peremptive.

For the reasons discussed below, we find that Article 198 is unconstitutional as applied to the facts of this case because it effectively terminates a biological parent's fundamental right to parent without due process as required under the Louisiana state constitution. Accordingly, for the reasons discussed below, we reverse the trial court's January 10, 2019 judgment upholding the constitutionality of Article 198, and we remand the matter to the trial court for further proceedings.

**Preliminary Issue of G.J.K.'s Standing**

The Louisiana Supreme Court clearly instructed that G.J.K. does not have standing to challenge the constitutionality of La. C.C. art. 198, and we are constrained by that holding. The Louisiana Supreme Court instructed:

> To have standing, a party must complain of a constitutional defect in the application of the statute to him or herself, not of a defect in its application to third parties in hypothetical situations." *Id.*; *Greater New Orleans Expressway Comm'n*, 892 So.2d at 573-574. Article 198 focuses on the rights of the biological father to establish paternity. In contrast, the rights of a child to establish filiation are addressed by La. Civ. Code art. 197, which provides in part, "[a] child may institute an action to prove paternity even though he is presumed to be the child of another man." A child's action is not subject to any peremptive period, except with regard to succession rights, where it must be brought within one year of the alleged father's death. *Id.* Thus, G.J.K. may institute an action to establish filiation to Mr. Andrews, even though Mr. Andrews' avowal action is perempted. Article 198 affects Mr. Andrews' rights. G.J.K's rights are controlled by Article 197. Under these circumstances, we find G.J.K. lacks standing to challenge the constitutionality of Article 198.

*Kinnett*, 332 So.3d at 1157.

Accordingly, considering the Louisiana Supreme Court's direct instructions to this Court, we are limited in our constitutional analysis to those arguments raised on behalf of Mr. Andrews. The Louisiana Supreme Court, however, did instruct that G.J.K. has standing to institute a filiation action under La. C.C. art. 197.[3] However, that issue is not before this Court at this time.

## Mr. Andrews' Constitutionality Challenge

At the trial on Mr. Andrew's supplemental petition challenging the constitutionality of Article 198, Mr. Andrews proffered his own testimony as well as the testimony of a child psychologist, Dr. Loretta Sonnier, to support his position that he, as G.J.K.'s biological father, *grasped the opportunity* to establish a relationship with G.J.K. and to prove that he has a fundamental constitutional right to parent G.J.K.[4]

At trial, Mr. Andrews offered testimony to support his position that, once he had actual knowledge of his paternity, he *grasped the opportunity* to have a meaningful role in the child's life and to exercise his parental rights. Between December 9, 2016—the date Ms. Kinnett contacted him to inform him that she "had sibling DNA tests on her two children and her husband was not G.J.K's biological father[5]"—and April 5, 2017—the date on which Ms. Kinnett cut off any

---

[3] G.J.K. asserts in brief to this Court that, as a minor child with no procedural capacity to sue under La C.C.P. art. 683, he cannot in fact institute an action under La. C.C. art. 197. The Louisiana Supreme Court in its opinion stated that G.J.K. has a right to institute a filiation action under La. C.C. art. 197. Although such an action, potentially filed by his court-appointed counsel on his behalf in connection with this litigation involving the issue of paternity, would likely be immediately met with an exception of lack of procedural capacity or similar procedural vehicle, at that point the validity and possible constitutionality of La. C.C. art. 197, and its application constrained by the limitation of La. C.C.P. art. 683, would be squarely before the Court for consideration.

[4] In its opinion instructing this Court to consider the constitutionality issue on remand, the Louisiana Supreme Court instructed that "[t]here is sufficient evidence in the record, *including the proffered evidence*, for the court of appeal to review the district court's judgment finding La. Civ. Code art. 198 to be constitutional." *Kinnett v. Kinnett*, 20-01134 (La. 10/10/21), 332 So.3d 1149, 1157 (emphasis added). Accordingly, for purposes of considering the constitutionality of La. C.C.P. art. 198 in this case, we consider in our analysis, as instructed, the testimony proffered by Mr. Andrews at trial.

[5] *Kinnett*, 332 So.3d at 1151.

17-CA-625                                                9

visitation or contact between Mr. Andrews and G.J.K.—he spent time with G.J.K. as he described in his testimony:

Mr. Andrews testified that on December 10, 2016—the day following the telephone call from Ms. Kinnett informing him that she learned with certainty that her husband was not G.J.K.'s biological father and, therefore, Mr. Andrews was G.J.K.'s biological father—he underwent an initial informational paternity test. On that date, he met Ms. Kinnett and G.J.K. at a medical testing facility for DNA testing and interacted with G.J.K. On December 20, 2016, Ms. Kinnett and Mr. Andrews met at a coffee shop for approximately one hour, during which he interacted with G.J.K. He testified that, initially, it was difficult to see G.J.K. because Ms. Kinnett had not informed Mr. Kinnett of G.J.K.'s paternity or that she had an affair with Mr. Andrews during the marriage.

On January 7, 2017, Mr. Andrews met Ms. Kinnett with G.J.K. and her daughter B.A.K. at Audubon Park to interact with G.J.K while the children played at the park. After that interaction, Ms. Kinnett additionally became concerned that her older child, B.A.K., would report to her father, Mr. Kinnett, that Mr. Andrews had met them at the park to interact with G.J.K.[6] On another occasion in January, Mr. Andrews met Ms. Kinnett at a coffee shop with G.J.K. On January 12 or 13, 2017, Mr. Andrews met Ms. Kinnett and G.J.K. at Ms. Kinnett's sister's home, where Ms. Kinnett was housesitting, for approximately two hours to interact with G.J.K. while and after Ms. Kinnett put B.A.K. to bed.

On January 22, 2017, days after Ms. Kinnett had filed for divorce from Mr. Kinnett, Mr. Andrews went to Ms. Kinnett's home with G.J.K. and B.A.K. present for approximately two hours to spend time with G.J.K.[7] On January 28, 2017, Mr.

---

[6] Mr. Andrews proffered various text messages between Mr. Andrews and Ms. Kinnett to corroborate his testimony and timeline of events.

[7] Mr. Andrews testified that, by January 22, 2017, after Mr. and Ms. Kinnett had separated, it was more comfortable for him to interact with G.J.K. while B.A.K. was present.

Andrews met Ms. Kinnett and G.J.K. at Ms. Kinnett's new apartment to help her clean and prepare the new apartment she secured after she and Mr. Kinnett separated. On that date, he interacted with G.J.K. for approximately two hours. On January 29, 2017, Mr. Andrews went to Ms. Kinnett's home and, while Ms. Kinnett took B.A.K. and a friend to the movies, he stayed with G.J.K. alone. Mr. Andrews testified that he interacted with the child for approximately four hours by himself; he played with G.J.K.; he put G.J.K. down for a nap; and he played with G.J.K. after he woke from his nap until Ms. Kinnett returned. On the following day, January 30, 2017, Mr. Andrews picked up G.J.K. from Ms. Kinnett's home and drove G.J.K. himself to a medical facility for the purpose of conducting a direct DNA test.[8]

On February 11, 2017, Mr. Andrews went to Ms. Kinnett's home and interacted with G.J.K.[9] for approximately four hours that evening, and spent the night in the home. He went on a morning walk and had breakfast with G.J.K. and Ms. Kinnett and remained with G.J.K. at the home for a couple of hours that morning. On February 19, 2017, he again visited G.J.K. at Ms. Kinnett's home in the afternoon into the evening while Ms. Kinnett prepared dinner and then put the children to bed. On March 3, 2017, Mr. Andrews went to Ms. Kinnett's home to meet her and G.J.K., who was off of school that day, to spend the day visiting the aquarium downtown with them. Mr. Andrews testified that thereafter he and Ms. Kinnett agreed for him to visit G.J.K. at Ms. Kinnett's home each Sunday afternoon, when she had custody that week, to help with the kids while she prepared dinner and did advanced meal-prep for the week. He testified that, on

---

[8] Mr. Andrews explained that the December 9, 2016 sibling DNA test had a 95% rate of accuracy to show that B.A.K. and G.J.K. were not full biological siblings. The DNA test taken December 10, 2016, was an "information test" that could not be used in court proceedings. Thus, a direct DNA evidence test was necessary to establish paternity legally and to prepare his avowal action.

[9] Mr. Andrews explained that by this time, Ms. Kinnett and Mr. Kinnett shared custody of the minor children and Ms. Kinnett did not have G.J.K. every weekend, so Mr. Andrews' ability to visit with G.J.K. became less frequent due to the custody arrangement between Mr. Kinnett and Ms. Kinnett.

average, he would arrive at 2:30 p.m. and would stay and interact with G.J.K. until approximately his 8:00 p.m. bedtime.[10] He testified this routine lasted approximately through March 17, 2017.

On March 24, 2017, Mr. Andrews reached out to Ms. Kinnett to visit with G.J.K. that Sunday, and Ms. Kinnett stated that counsel had advised that he should not visit with G.J.K. anymore and, further, that Mr. Kinnett did not want Mr. Andrews interacting with the child. However, thereafter, Mr. Andrews and Ms. Kinnett made plans for him to visit for dinner on April 5, 2017, from approximately 5:00 p.m. until G.J.K.'s bedtime. Mr. Andrews testified that was the last interaction he had with the minor G.J.K., and that Ms. Kinnett refused to allow him to interact with G.J.K. thereafter.

Mr. Andrews testified to his belief that Ms. Kinnett cut off communication after she received discovery in the beginning of April from Mr. Andrews' counsel reflecting that he intended to introduce at trial text messages or communications between himself and Ms. Kinnett that demonstrated Ms. Kinnett took the sibling DNA test and had a suspicion that Mr. Andrews could be the father before disclosing that information to Mr. Kinnett or his family. Mr. Andrews testified that his intent to use those text messages in litigation caused a "rift" between him and Ms. Kinnett because she was concerned as to how it would make her appear to Mr. Kinnett's family and, further, because it would demonstrate that she was not truthful, even after disclosure, to Mr. Kinnett about the extent or duration of the relationship between Mr. Andrews and Ms. Kinnett. Following an April 15, 2017 hearing wherein Mr. Andrews testified concerning the extent and duration of their relationship, Ms. Kinnett's counsel advised that Ms. Kinnett would no longer allow Mr. Andrews to play a role in G.J.K.'s life.

---

[10] He also testified that on one occasion he purchased materials to hang an outdoor baby swing at Ms. Kinnett's home for G.J.K. and spent time pushing G.J.K. on the swing in Ms. Kinnett's backyard.

Concerning financial support, Mr. Andrews testified that he provided financial assistance to Ms. Kinnett in the amount of $3,495.00 toward the security deposit and first month's rent to move into a new apartment after she and Mr. Kinnett separated. The following month, he provided Ms. Kinnett $1,000.00, toward expenses.[11] Concerning actions Mr. Andrews took to prepare for visitation or custody with G.J.K., he testified that he converted the spare bedroom in his apartment into a nursery in preparation to have G.J.K. in his home, including purchasing a crib, bedding, decorations, and dresser set for the nursery. He also testified that he purchased a car seat and baby-proofed his apartment with electric outlet covers to make the apartment suitable for G.J.K.[12]

When questioned as to why he waited until February 2017 to file his avowal action after learning of the DNA results in December 2016, Mr. Andrews responded that Mrs. Kinnett and her counsel asked him to "hold off" on filing his avowal action until after the holidays so as to not ruin the children's Christmas. He testified he learned that on or about January 7, 2017, Ms. Kinnett and Mr. Kinnett got into an argument, during which Ms. Kinnett "blurted out" that Mr. Kinnett was not the biological father to G.J.K., and that thereafter, Ms. Kinnett and her counsel asked Mr. Andrews to hold off on filing his avowal action to "give everyone a chance to catch their breath."

Mr. Andrews also proffered the testimony of Dr. Loretta Sonnier, a board certified psychiatrist with added qualifications in forensic psychiatry and child and adolescent psychiatry.[13] Dr. Sonnier did not interview or evaluate any of the parties

---

[11] Mr. Andrews proffered two checks into evidence to corroborate his testimony, one check made payable to Ms. Kinnett for $1,000.00 and a second check in the amount of $3,495.00 to cover expenses for the apartment's security deposit and first month's rent. Mr. Andrews also proffered text message exchanges between himself and Ms. Kinnett concerning him financially helping her with the initial expenses of finding an apartment.

[12] Mr. Andrews proffered photographs of the nursery in his home.

[13] The qualifications of Dr. Sonnier were set forth at the proffer and demonstrate that Dr. Sonnier is a board certified psychiatrist with added qualifications in forensic psychiatry and child and adolescent psychiatry. She is an assistant professor at Tulane University, teaching law and psychiatry. She completed a triple board residency at Cincinnati Children's Hospital in pediatric, child and adolescent psychiatry, and forensic psychiatry, and served as triple-board Chief Resident. She has testified before the

involved in this litigation. Rather, she testified that she reviewed the evidence in the case and the relevant law, Article 198. As applied to this case, Dr. Sonnier considered the benefits and the harms that could come to G.J.K. if he were to be raised not knowing his biological father and further considered any harm that could come to G.J.K. from the avowal of Mr. Andrews as his biological father. Dr. Sonnier testified that an "unplanned disclosure," or a child finding out about his or her origins at a point in time not planned, is the most traumatic manner in which to learn that you have an undisclosed biological parent. She testified that a child most likely would "experience a sense of betrayal and confusion in their legal parents and a sense of abandonment by their biological parents."

When questioned concerning the language of Article198 restricting the time frame in which a biological father could initiate an avowal action when the mother is married at the time of the child's birth, she testified that while the purpose of the one-year time limitation would be to preserve the "intact family," she stated "that did not apply in this case because it was not an intact family, so G.J.K.'s already impacted by the conflict of divorce."

Dr. Sonnier discussed her understanding of the term "intact family" to mean that both parents live in the home. She further stated that divorce inherently allows for the possibility of the introduction of other adults into the child's life, such as each parents' significant others and/or the introduction of stepparents.[14]

Dr. Sonnier opined that the imposition of a one-year preemptive period as presented in Article 198 is not "developmentally informed," meaning that is it not based on any science in the field of child psychology. She further stated that the intended purpose of La. C.C. art. 198, to protect children, is not furthered by the

_____

Louisiana House of Representatives in May of 2017, and also before the Louisiana Senate Justice Reinvestment Initiative subcommittee in January 2017, relating to adolescent brain development in connection with a bill being considered by the Senate at that time. As we have been instructed by the Louisiana Supreme Court, we consider Dr. Sonnier's proffered testimony in our constitutional analysis.
[14] A second divorce for one or both parents would result in the possibility of a second (or third) set of stepparents or yet another set of adults being introduced into the child's life.

one-year time limitation and "de facto, does not protect children," is not "rationally related" to that purpose, and is not in a child's best interest. Dr. Sonnier testified that such a determination requires an individualized evaluation of each set of circumstances presented, which the Article does not allow for.

Concerning the psychological impact of the one-year peremptive period set forth in Article 198, Dr. Sonnier opined: "I agree that compelling someone to act quickly, would be in the child's best interest; however, foreclosing on any possibility for the remainder of the child -- of a child's lifetime after a time frame has elapsed, I -- I don't believe that's in the child's best interest." Stated another way, she testified, "it seems rather arbitrary to me to acknowledge that it's in a child's best interest to act quickly and to have a relationship and then to say time's up, never mind, and to not allow it anymore," for the remainder of the child's life.

**Law and Analysis**

We now consider only Mr. Andrew's challenge to Article 198's constitutionality.

As a general rule, statutes are presumed to be constitutional. *W. Feliciana Par. Gov't v. State*, 19-00878 (La. 10/11/19), 286 So.3d 987, 993-94. Because the provisions of the Louisiana Constitution are not grants of power, but instead are limitations on the otherwise plenary power of the people, exercised through the legislature, the legislature may enact any legislation that the constitution does not prohibit. *Id.* Because a state statute is presumed constitutional, the party challenging the statute bears the burden of proving its unconstitutionality. *Id.*; *see also State v. Brenner*, 486 So.2d 101 (La. 1986). However, this presumption does not apply when a statute infringes upon a fundamental right. *State v. Spell*, 21-00876 (La. 5/13/22), 339 So.3d 1125, 1131.

When constitutional challenges are made under both the federal and state constitutions, we must first consider whether the case may be resolved on state

constitutional grounds. *See State v. Perry*, 610 So.2d 746, 751 (La. 1992). The Louisiana Constitution of 1974 provides that no person shall be deprived of life, liberty or property, except by due process of law. La. Const. Art. 1, § 2. Due process of law is guaranteed by both the Fourteenth Amendment to the United States Constitution and Art. 1, § 2 of the 1974 Louisiana Constitution. Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Fairbanks v. Beninate*, 20-206 (La. App. 5 Cir. 12/23/20), 308 So.3d 1222, 1232, quoting *Garcia v. Hernandez*, 21-338 (La. App. 5 Cir. 4/11/22), 339 So.3d 61, 65-66. Persons whose rights may be affected by state action are entitled to be heard, and, in order that they may enjoy that right, they must first be notified. *Id*.

It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a *meaningful time* and in a *meaningful manner*. *In re A.J.F.*, 00-0948 (La. 6/30/00), 764 So.2d 47, 55 (emphasis added); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Wilson v. City of New Orleans*, 479 So.2d 891 (La.1985); *State v. Woodard*, 387 So.2d 1066 (La. 1980).

When the due process clauses are invoked in a novel context, the established practice is to begin the inquiry with a determination of the precise nature of the private interest that is threatened. *See Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The protections of due process come into play only if the private interest asserted is constitutionally cognizable. Where fundamental rights are at stake, due process is satisfied only when the government has a compelling interest that justifies infringing upon the right, and the law employs the least restrictive means to achieve the government's objective. *State v.*

*Draughter*, 13-0914 (La. 12/10/13), 130 So.3d 855, 863; *Hondroulis v. Schuhmacher*, 553 So.2d 398, 415 (La. 1988).

To determine whether due process has been satisfied, courts consider first the private interest that will be affected; second, the risk of erroneous deprivation of such interest through the procedures used; and, finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *State in Int. of A.C.*, 643 So.2d 719, 724 (La. 1994), *on reh'g*, 93-1125 (La. 10/17/94), 643 So.2d 743, citing *In re Adoption of B.G.S.*, *supra*, at 552. The balancing of these factors and the determination of whether or not due process has been satisfied is administered under the three-factor test as espoused by the United States Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and adopted by the Louisiana Supreme Court (when interpreting the Louisiana state constitution) in *Wilson v. City of New Orleans*, 479 So.2d 891 (La. 1985) and *In re Adoption of B.G.S.*, 556 So.2d 545 (La. 1990); *see also State in Int. of A.C.*, 643 So.2d 719, 726 (La. 1994), *on reh'g*, 93-1125 (La. 10/17/94), 643 So.2d 743.

The United States Supreme Court has declared it "plain beyond the need for multiple citation" that a biological parent's right to "the companionship, care, custody, and management" of his children is a liberty interest far more important than any property right. *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). The Louisiana Supreme Court has stated, albeit in an adoption proceeding context, that "the interest of a biological parent in having an opportunity to establish a relationship with his child is one of those liberties of which no person may be deprived without due process of law under our state constitution." *In re Adoption of B.G.S.*, 556 So.2d 545, 550 (La. 1990). *See also Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("[I]t cannot now be doubted that the Due Process Clause of the Fourteenth

Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."); *State of Louisiana in the Interest of J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806 ("The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law ... and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship.").

A biological father's cause of action to avow his child has its basis in constitutional rights. *See Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ("The rights to conceive and to raise one's children have been deemed 'essential,' ... 'basic civil rights of man.' "). As such, an avowal action is based on rights which flow from the Constitution. *W.R.M. v. H.C.V.*, 06-0702 (La. 3/9/07), 951 So.2d 172, 180 (Weimer, J. concurring) (quotations omitted).

However, as the United States Supreme Court has repeatedly stated, a parent's constitutional right to parent his child does not arise by the mere circumstance of his child's birth. Rather, his liberty interest to parent his child arises with his demonstration of a full commitment to the responsibilities of parenthood by coming forward to participate in rearing his child. *Troxel*, *supra*, at 197. The right of avowal is not absolute; it is the relationship with the child that is determinative, not mere biological connection. *W.R.M. v. H.C.V.*, 951 So.2d at 181. If he *grasps that opportunity* and accepts some measure of responsibility for the child's future, a biological parent may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. *In re Adoption of B.G.S.*, 556 So.2d 545, 550 (La. 1990).

In the context of a circumstance where a child is conceived and born during a marriage between the biological mother and her husband as a result of an

extramarital affair between the mother and a biological father, the United States Supreme Court has stated that, "the natural father's unique opportunity conflicts with the similarly unique opportunity of the husband of the marriage; and it is not unconstitutional for the State to give categorical preference to the latter." *Michael H. v. Gerald D.*, 491 U.S. 110, 129, 109 S.Ct. 2333, 2345, 105 L.Ed.2d 91 (1989). In *Michael H. v. Gerald D.*, Gerald D.'s wife had an affair with Michael H., and a daughter was born of that relationship. Blood tests confirmed Michael's paternity within the first several months after the birth, and for the first three years of the child's life, Michael had a relationship with the child. When the mother kept Michael from seeing his daughter, he filed a paternity action. However, California law established a conclusive presumption that the husband of the mother was the father of any children born into the marriage, and Michael was denied standing to rebut the presumption. The United States Supreme Court granted certiorari to address Michael's due process claims.

Justice Scalia, writing for the plurality, emphasized the requirement that the "asserted liberty interest be rooted in history and tradition," and found no evidence that an "adulterous natural father's" right to assert "parental rights over a child born into a woman's existing marriage with another man" had ever received special protection. *Michael H.*, 491 U.S. at 122-25, 109 S.Ct. at 2342-2343. Instead, he declared that the "presumption of legitimacy was a fundamental principle of the common law." *Id.* at 124, 109 S.Ct. at 2343 (citing H. Nicholas, Adulturine Bastardy 1 (1836)). The historical policy behind the conclusive presumption was predominately "an aversion to declaring children illegitimate, thereby depriving them of rights of inheritance and succession, and likely making them wards of the state." *Id.* (internal citations omitted).

However, the United States Supreme Court contemporaneously emphasized in the *Michael* opinion that, "[w]hat counts is whether the States in fact award

substantial parental rights to the natural father of a child conceived within, and born into, an extant marital union that wishes to embrace the child." *Id* at 127. Since the 1989 *Michael* decision by the United States Supreme Court, issued more than thirty years ago, Louisiana has, jurisprudentially and legislatively, acted to "in fact award substantial parental rights to the natural father of a child conceived within, and born into, an extant marital union." *Id*. Louisiana recognizes "dual paternity" with a long line of jurisprudence recognizing a scenario where a child might have a biological father as well as a legal presumptive father with substantive parental rights. *Gallo v. Gallo*, 03-0794 (La. 12/3/03), 861 So.2d 168, 178; *State, Dep't of Child. & Fam. Servs. ex rel. A.L. v. Lowrie*, 14-1025 (La. 5/5/15), 167 So.3d 573, 580; *see also State ex rel. Wilson v. Wilson*, 37,674 (La. App. 2 Cir. 9/24/03), 855 So.2d 913, 914, *writ denied sub nom. State ex rel. C.W. v. Wilson*, 03-2970 (La. 1/16/04), 864 So.2d 633.

Louisiana has adopted a unique dual paternity scheme and has granted a biological father substantive parental rights, even where the child is born into an intact family. *See State, Dep't of Child. & Fam. Servs. ex rel. A.L*, 167 So.3d at 580. We find that this unique dual paternity scheme, granting a biological father the right to parent his biological child with the biological mother and a presumed legal father, signifies that the biological father, who steps forward and g*rasps the opportunity* to parent his child when presented with the opportunity, has a fundamental vested liberty interest under Louisiana law in the parenting of his biological child. That liberty interest is subject to due process under our Louisiana state constitution.

Upon review of the record before us, as well as Mr. Andrew's testimony proffered at trial as set forth above, we find, without question, that Mr. Andrews took every opportunity available to him to quickly develop a relationship with G.J.K. Mr. Andrews testified that the day after Ms. Kinnett informed him that her

two children were not full biological siblings, he underwent a paternity test to determine paternity. He then made an effort to interact with G.J.K. on a consistent basis and financially contributed to support Ms. Kinnett and G.J.K. while she navigated establishing a new residence after she and Mr. Kinnett separated. The record before us fully supports a finding that Mr. Andrews has demonstrated that he has *grasped the opportunity* to parent his biological child, G.J.K., and that he has established a vested liberty interest in the constitutional right to parent his biological child, G.J.K.

We next consider the risk of erroneous deprivation of a biological father's right to parent under the procedures or safeguards provided in Article 198. The language of the article, which sets forth a one-year peremptive period, not subject to interruption or suspension, provides *no notice* requirement to a biological father and *no duty* on behalf of the biological mother to inform the biological father of his possible paternity. The very narrow exception under Article 198 applies when a trial judge makes a factual finding that the biological mother acted in bad faith— which requires either a finding of ill or malicious intent or evidence to demonstrate that the biological mother directly, clearly, and intentionally misled the biological father to believe that her husband was in fact the biological father.

The Louisiana Supreme Court's recent interpretation of the language "bad faith" as set forth in its most recent opinion in this matter instructs that "'a mother who knows another man is possibly the father of her child' is not in bad faith in failing to disclose that knowledge of possible paternity after the child's birth if a trial judge finds credible the mother's belief that one man, rather than the other— whom she had sexual relations within a single conception period— is the father." *Kinnett*, *supra*, 345 So.3d at 1129-30, quoting *Kinnett*, *supra*, 332 So.3d at 1156.

In other words, the mere belief that one of the two or three or possibly more partners with whom a woman has sexual relations in a likely one-week conception

period could be the biological father of the child, under the Court's interpretation, does not require the mother to notify or inform any partner even after the birth of a child before a biological father's rights may become perempted. She is under no duty to take legal action or to investigate or undergo DNA testing. The biological father, however, is forced to interject himself into a marriage by filing a public suit, most likely causing upheaval or divorce, even if the child ultimately is determined to not biologically be his child, in order to preserve his parental rights. This seems to be in direct conflict with the purpose of the Article—to maintain intact families and prevent the upheaval of litigation. In some scenarios, a biological father may have no knowledge that a child has been born, yet may be deprived of the opportunity to establish his constitutional right to parent his child.[15]

We further point out that "'an impartial decision maker is essential' to due process." *In re Adoption of B.G.S.*, *supra*. Under the language of Article 198 in conjunction with the Louisiana Supreme Court's narrow interpretation of the term "bad faith" as set forth in its opinion, *Kinnett v. Kinnett*, *supra*, the biological mother alone in many circumstances will control whether the biological father is notified of her pregnancy or the child's birth. "[T]he placement of decision in the hands of a potentially adverse decision maker, violates the most basic principles of due process under both our state and federal constitutions." *Adoption of B.G.S.* at 556.

Finally, we consider the government interest at stake and whether such interest is a compelling one sufficient to justify infringing upon Mr. Andrews' fundamental right to parent his biological child. The comments to Article 198 state that the Article's "time period of one year from the child's birth imposed upon the

---

[15] As stated earlier, because there was no finding of bad faith in this case, any factual finding concerning constructive knowledge of possible paternity is irrelevant. Nevertheless, we point out that such a fundamental right as the right to parent a biological child should not rest on a trial judge's determination that an individual likely had a fleeting suspicion of possible paternity in a case where contraceptives were physically in place during intercourse and, after the birth of a child, the biological mother informed the biological father that she had subsequently reunited with her husband and gotten pregnant.

alleged father if the child is presumed to be the child of another man" is "intended to protect the child from the upheaval of such litigation and its consequences in circumstances where the child may actually live in an existing intact family with his mother and presumed father or may have become attached over many years to the man presumed to be his father."

Without this Court opining on the issue, the Louisiana Supreme Court has consistently pointed out that a divorced household is not, in the legal sense, considered an "intact family" as the language has historically been utilized or contemplated by the Louisiana legislature. *See State, Dep't of Child. & Fam. Servs. ex rel. A.L. v. Lowrie*, 14-1025 (La. 5/5/15), 167 So. 3d 573, 585, citing La. R.S. 9:315 ("While the legislature acknowledges that the expenditures of two-household divorced, separated, or non-formed families *are different from intact family households*, it is very important that the children of this state not be forced to live in poverty because of family disruption and that they be afforded the same opportunities available to children in intact families… .) (emphasis added); approvingly cited by *Estapa v. Lorenz*, 11-852 (La. App. 5 Cir. 3/27/12), 91 So.3d 1103, 1106; *see also* La. C.C. art. 194, Rev. Cmt. (defining "child as a member of an intact family [is a child] resulting from the marriage of the mother and alleged father."); *See also State, Dep't of Child. & Fam. Servs. ex rel. A.L. v. Lowrie*, 14-1025 (La. 5/5/15), 167 So.3d 573, 581, citing *Pociask v. Moseley*, 13-0262 (La. 6/28/13), 122 So.3d 533, 538; *Gallo v. Gallo*, 03-0794 (La. 12/3/03), 861 So.2d 168, 174; *T.D. v. M.M.M.*, 98-0167 (La. 3/2/99), 730 So.2d 873, 878 (concurring opinion), *abrogated on other grounds by Fishbein v. State ex rel. Louisiana State Univ. Health Scis. Ctr.*, 04-2482 (La. 4/12/05), 898 So.2d 1260 ("Where a marital unit is intact, the State's interest in preserving the integrity of the marital family may also silence a biological father's competing interests.... However, once the bonds of matrimony are dissolved *a vinculo matrimonii,* the State's interest in

preserving the marital family disappears.... Today's realities are that illegitimacy and 'broken homes' have neither the rarity nor the stigma as in the past. When parenthood can be objectively determined by scientific evidence, and where illegitimacy is no longer stigmatized, presumptions regarding paternity are 'out of place.' ").

Moreover, the Louisiana marital presumption's evolving path illustrates that history and tradition must sometimes give way to truth gained from experience, science, and technology. When the social and legal consequences associated with illegitimacy were dire, and the only actual proof of paternity was long absence, the State's interest in providing protection for innocent children was compelling, whether or not the method of providing protection was wholly effective. Today, when the evolution of the law and society has rendered the protection of the child from negative social and legal consequences unnecessary, and scientific advances make proof of paternity a simple scientific reality, the State's interest in protecting children no longer justifies the maintenance of legal fiction in the face of biological fact. The marital presumption and its purposes no longer justify denying the existence of a biological father's constitutional right to parent. *Kinnett*, 302 So.3d at 196 (Wicker, J., concurring) (quotations omitted).

While the State's interest in protecting the child is important, Article 198's peremptory period is not so sufficiently related to achieving that interest that it outweighs the risk of erroneous deprivation of the biological father's constitutionally protected interest in an opportunity to develop a relationship with his child. *Id*.

We find that, under the specific facts of this case where Mr. Andrews intervened into a divorce proceeding before the child attained the age of 18 months old (and, thus, had not become attached over many years to the presumed father) and where Mr. Andrews had consistent interaction with G.J.K. when permitted by

Ms. Kinnett to establish a relationship with him, the government interest at stake—maintaining the intact family unit or protecting the child after he or she has become attached to the presumed father over the course of many years—is not compelling under the facts of this case and cannot justify deprivation of Mr. Andrews' vested constitutional right to parent G.J.K.

## DECREE

Accordingly, for the reasons explained herein, we find first that Mr. Andrews has established a vested liberty interest in the constitutional right to parent his biological child, G.J.K. We further find that Article 198 as applied to the facts of this case is unconstitutional and violates Mr. Andrew's right to due process under the Louisiana state constitution. We therefore reverse the trial court's January 10, 2019 judgment upholding the Article's constitutionality in this case, and we remand this matter to the trial court for further proceedings consistent with this opinion.

**REVERSED; REMANDED**



SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
INTERIM CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**DECEMBER 28, 2022** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

# 17-CA-625

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE FRANK A. BRINDISI (DISTRICT JUDGE)
ALLISON K. NESTOR (APPELLEE)     LEONARD L. LEVENSON (APPELLEE)     JACQUELINE F. MALONEY (APPELLEE)
DESIREE M. VALENTI (APPELLANT)   SHARON L. ANDREWS (APPELLANT)      STEPHANIE A. FRATELLO (APPELLANT)
THOMAS A. ROBICHAUX (APPELLANT)  RAMONA G. FERNANDEZ (APPELLEE)

### MAILED
HONORABLE JEFFREY M. LANDRY       TRACY G. SHEPPARD (APPELLEE)        CHRISTIAN W. HELMKE (APPELLEE)
(APPELLEE)                        ATTORNEY AT LAW                     DONNA R. BARRIOS (APPELLEE)
ATTORNEY GENERAL                  412 DOLHONDE STREET                 ATTORNEYS AT LAW
LOUISIANA DEPARTMENT OF JUSTICE   GRETNA, LA 70053                    424 GRAVIER STREET
1885 NORTH 3RD STREET                                                 NEW ORLEANS, LA 70130
6TH FLOOR, LIVINGSTON BUILDING    DAVID J. SMITH, JR. (APPELLEE)
BATON ROUGE, LA 70802             JEFFREY M. WALE (APPELLEE)
                                  ASSISTANT ATTORNEY GENERALS
ASHLEY FISHER  (APPELLEE)         LOUISIANA DEPARTMENT OF JUSTICE
ELIZABETH FOX  (APPELLEE)         POST OFFICE BOX 94005
LINDSAY DEAN  (APPELLEE)          BATON ROUGE, LA 70804-9005
STUDENT PRACTITIONER
STUART H. SMITH LAW CLINIC &
CENTER FOR SOCIAL JUSTICE
7214 ST. CHARLES AVENUE
NEW ORLEANS, LA 70118