# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #049

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **25th day of October, 2024** are as follows:

**BY Crichton, J.:**

 *2024-C-00500*      *LOUISIANA BOARD OF ETHICS IN THE MATTER OF MICHELLE BARNETT*

REVERSED. SEE OPINION.

Crain, J., concurs.

# SUPREME COURT OF LOUISIANA

## No. 2024-C-00500

## LOUISIANA BOARD OF ETHICS IN THE MATTER OF MICHELLE BARNETT

On Writ of Certiorari to the Court of Appeal, First Circuit, Louisiana Board of Ethics

## CRICHTON, J.[*]

We granted the writ application in this matter to determine whether Michelle Barnett, an employee of the Louisiana Department of Health Hospitals, was in violation of the Louisiana Code of Governmental Ethics by allegedly receiving a thing of economic value from a prohibited source. For the reasons that follow, we find no violation of the Code of Ethics as charged. The court of appeal opinion and the ruling of the Ethics Adjudicatory Board are reversed, and the charges are dismissed.

## FACTS AND PROCEDURAL HISTORY

Following an investigation pursuant to the authority granted in La. R.S. 42:1141(C),[1] on January 16, 2015, the Louisiana Board of Ethics ("BOE") issued charges against Michelle Barnett, an employee of the Louisiana Department of Health and Hospitals ("DHH"[2]), for a potential violation of La. R.S.

---

[*]Justice Jeannette Theriot Knoll, retired, appointed Justice *Pro Tempore*, sitting for the vacancy in Louisiana Supreme Court District 3.

[1]La. R.S. 42:1141(C) provides:

> C. (1) Upon receiving a sworn complaint or voting to consider a matter as provided in Subsection B of this Section, a private investigation shall be conducted to elicit evidence upon which the Board of Ethics shall determine whether a public hearing should be conducted or that a violation has not occurred. The accused and the complainant shall be given written notification of the commencement of the investigation not less than ten days prior to the date set for the commencement of the investigation.

[2]In 2016, the Louisiana Legislature amended and reenacted La. R.S. 36:251 to change the name of DHH to the Louisiana Department of Health. *See* Acts 2016, No. 300 § 1, eff. June 2, 2016.

1

42:1111(C)(2)(d).[3]  The allegations specified that Mrs. Barnett, by virtue of her receipt of compensation through her husband's rendering of employment services to Magellan Health Services, while Magellan had a contractual, business, or financial relationship with Mrs. Barnett's agency, DHH, Office of Behavioral Health, Business Intelligence Section, received a thing of economic value from a prohibited source from July 2012, until August 25, 2014.  The charges alleged, in pertinent part:

I.

Michelle Barnett is an employee of the Louisiana Department of Health and Hospitals (DHH).  Michelle Barnette was hired by the DHH, Office of Behavioral Health (OBH) as a Program Manager 1, on April 29, 2011.

II.

Michelle Barnett has been married to Tom Barnett since June 11, 1988.

III.

The DHH was created by Act 513 of the 1976 Legislative Session as one of the twenty principal departments of the Executive Branch of the Louisiana State Government.  The OBH was created within the DHH by Act 384 of the 2009 Legislative Session.

IV.

Ms. Barnett was promoted to the DHH/OBH, Program Manager 2, over the Business Intelligence Section in September of 2011.  In this capacity, she served as manager of the Electronic Behavioral Health Record System (EBHR).  As the manager of EBHR, her responsibilities included managing an effective, ongoing data exchange with the Statewide Management Organization (SMO).  The SMO operates as a single point of entry to behavioral health services by managing behavioral health services for Medicaid and Non-Medicaid eligible populations served by the Office of Behavioral Health (OBH).

V.

---

However, because the events at issue herein occurred prior to this amendment, this opinion will refer to the department as "DHH."

[3]La. R.S. 42:1111(C) provides:

C. Payments for nonpublic service.

. . .

(2) No public servant and no legal entity in which the public servant exercises control or owns an interest in excess of twenty-five percent, shall receive any thing of economic value for or in consideration of services rendered, or to be rendered, to or for any person during his public service unless such services are:

. . .

(d) Neither performed for nor compensated by any person from whom such public servant would be prohibited by R.S. 42:1115(A)(1) or (B) from receiving a gift.

Magellan Health Services was selected as SMO on November 17, 2011.

VI.

In February of 2013, Ms. Barnett's job duties were reclassified to provide that she would be responsible for managing the effective data exchange with the SMO in order to manage and evaluate the SMO. She worked with a team that included the SMO staff to create reports and summaries based on data submitted by Magellan to measure the performance of the SMO.

VII.

In July of 2012, Tom Barnett was hired by Magellan as a Senior Network Business Analyst. His job duties include analysis and production of reports in support of the Magellan provider network for the OBH. These reports, including quarterly reports, were prepared and issued to the DHH/OBH.

VIII.

In October 2013, when requested by the DHH to work on a request for proposals for the SMO, Ms. Barnett disclosed that her husband, Tom Barnett, worked for Magellan. The DHH subsequently moved Mrs. Barnett laterally to another Program Manager 2 position that is not involved with the Magellan contract.[4]

The matter proceeded to an adjudicatory hearing before a panel of Administrative Law Judges with the Division of Administration on October 13 and 14, 2022. The panel heard testimony from Karen Stubbs, then-Assistant Secretary of OBH, and Mr. and Mrs. Barnett. The parties each offered exhibits into evidence, some admitted over the objections of their respective opponent.[5]

---

[4]Mrs. Barnett filed a motion for summary judgment on March 6, 2020, asserting the Board of Ethics could not satisfy its burden of proof as to the identity of the agency that Michelle Barnett worked for, the existence of a contractual or other business or financial relationship with Michelle Barnett's actual agency, or that her husband was a prohibited source. In support, she attached four affidavits (including her own) of employees of DHH/OBH. The Board of Ethics opposed summary judgment, urging the affidavits contain "conclusory attestations concerning a respondent's public employee or public servant status (the threshold issue before the EAB) and that are not subject to cross-examination" and are therefore of little evidentiary value as to whether the Board could carry its burden of proof. Following a hearing on the motion on July 13, 2020, the Board denied Mrs. Barnett's motion for summary judgment.

[5]The Board of Ethics offered sixteen exhibits into evidence, including: the affidavit of Ms. Carolyn Abadie Landry, Executive Secretary of the Louisiana Board of Ethics; pertinent laws which created the Louisiana Department of Health and Hospitals and OBH; excerpts from Mrs. Barnett's personnel file from her first position at DHH through her fourth position at DHH effective August 25, 2014; Mr. and Mrs. Barnett's marriage license; Mr. Barnett's personnel file produced by Magellan; Mr. Barnett's financial disclosure statements; excerpts of the Request for Proposal issued by DHH/OBH for a Statewide Management Organization for the Louisiana Behavioral Health Partnership; the contract (and a subsequent amendment) between DHH/OBH and Magellan Health Services, Inc.,; a December 10, 2013, letter from Stephen Russo (Executive Counsel for DHH) presenting the potential ethical violations by Mrs. Barnett; and Mrs. Barnett's conflict of interest statement dated October 11, 2013 (signed by Mrs. Barnett and containing a handwritten notation that "[m]y husband works for Mgln").

The first witness to testify at the hearing was Ms. Stubbs,[6] who stated that in 2013, she was serving as the Deputy Assistant Secretary over Health Plan Management.[7] She indicated that her section focused on policy development through data study and managing Medicaid-covered behavioral health services for the uninsured population in Louisiana. When Ms. Stubbs was hired, she became Mrs. Barnett's supervisor. In reviewing the various exhibits submitted by the Board of Ethics, Ms. Stubbs testified Mrs. Barnett was in the Business Intelligence section of the Office of Behavioral Health. According to Ms. Stubbs testimony, the documents also reflected that Mrs. Barnett's duties would have included interaction with the SMO, which was Magellan[8] at the time. Ms. Stubbs also recalled a conversation she had with Mrs. Barnett, during which Mrs. Barnett disclosed that her husband worked for Magellan, but, as a new supervisor, Ms. Stubbs assumed at the time that any potential conflict had already been addressed.

Mr. Barnett testified that he began working for Magellan in July of 2012 as a "Senior Network Business Analyst," generating reports regarding various providers in a healthcare provider network and placing them in a "directory," but he was unaware of where the report went from that point or how it interfaced with Mrs. Barnett's agency. Mr. Barnett also noted that while he believed he was working for

---

Mrs. Barnett offered as evidence the following: the Board of Ethics' charges filed against her; the job position description for Program Manager 2 (and related charts); the DHH Conditional offer of employment to Mrs. Barnett dated February 29, 2012; an October 2, 2014, letter to Tina Perkins (staff investigator for the Board of Ethics) regarding a subpoena duces tecum; salary information for Mr. Barnett (from Magellan HRSC, Inc.); and Mr. Barnett's W-2 IRS forms from the time period at issue.

[6]Ms. Stubbs identified herself at the beginning of her testimony as Ms. Karen Stubbs Church, but noted she typically goes by Karen Stubbs. Therefore, she will be identified herein as Ms. Stubbs.

[7]Ms. Stubbs has since been promoted to Assistant Secretary of the Office of Behavioral Health.

[8]Ms. Stubbs testified that Magellan was also "Magellan Health Services, Incorporated," noting that "they had a couple of legal name changes throughout the course of our contracting, but I believe they did at one point go by Magellan Health Services." Similarly, Mr. Barnett testified as to the various names of Magellan during his employment there, including Magellan Health Services, Magellan HRSC, Inc., Magellan Behavioral Health Services, Documents of Magellan, and Magellan of Louisiana.

4

"Magellan Health Services," as indicated on his Financial Disclosure Documents for the calendar years 2012, 2013, and 2014,[9] his W-2 Forms submitted to the IRS stated his Employer's name as "Magellan HRSC, Inc." ("Magellan HRSC"). He testified that no one had explained any difference to him and he "didn't know the distinction." Mr. Barnett also stated that Magellan HRSC has a different taxpayer identification number than Magellan Health Services and their corporate addresses are different.

Finally, Mrs. Barnett testified and as noted by the court of appeal, she fervently disputed the ethics charges against her and the accuracy of the evidence offered in support of those charges. For instance, the charges stated that Mrs. Barnett began working for DHH-Medicaid as a Program Manager 1 in April of 2011, but she actually began her employment with DHH-Medicaid as a Program Manager 2 in April 2011. This information is reflected in an exhibit offered by the Board of Ethics, which reflects Ms. Barnett's hire date of April 29, 2011, as "Medic Prog MGR 2" for "DHH-Medical Vendor Admin."

Mrs. Barnett repeatedly testified that she did not work directly with the SMO, stating that she worked in the Analytics unit of the Business Intelligence section (part of the Health Plan Management division of OBH), which dealt with local governmental entities and not the SMO. Mrs. Barnett disputed the evidence offered by the Board of Ethics, as explained by the court of appeal:

> Mrs. Barnett also testified that the job descriptions and organizational charts offered by the BOE and reviewed by Ms. Stubbs were so inaccurate they "floored" her. In particular, the excerpts of Mrs. Barnett's DHH personnel file included two "Position Description" forms with attached "Duties and Responsibilities" documents containing "Occupational Summary" sections. The first "Position Description" form showed an effective date of September 22, 2011. The accompanying "Occupational Summary" stated, in pertinent part, "OBH is the lead agency of the Louisiana Behavioral Health Partnership, a new behavioral health managed coordinated system of care (CSOC) involving five state agencies, contracted through a

---

[9]Although these financial disclosure documents were executed for different calendar years, they were each signed by Mr. Barnett on May 10, 2015. These disclosure statements indicated that he, Mr. Thomas Richard Barnett, was the "spouse of a public servant," identifying that public servant as Michelle L. Barnett, who was employed as a "Program Manager 2" with DHH/OBH.

Statewide Management Organization (SMO)." The Occupational Summary further provided that, as the manager of the Electronic Behavioral Health Record System (EBHRS), Mrs. Barnett's responsibilities would include managing an effective and ongoing data exchange with the SMO. Mrs. Barnett pointed out that she did not sign the first Position Description form and disputed the accuracy of the Occupational Summary.

The second Position Description form showed an effective date of February 23, 2013, and contained a note that read "Business Reorg[.]" The second Position Description was marked to indicate that an organizational chart and a "Duties and Responsibilities" document were attached, and the revised Occupational Summary provided that Mrs. Barnett would serve as the "Clinical Services Quality/Performance Accountability Branch Program Manager[.]" The Occupational Summary stated that Mrs. Barnett would be "responsible for the development, implementation[,] and ongoing management of the OBH Data Mart/Business Intelligence (DM/BI) system for clinical services data, analyses of these data, and reporting of quality and performance metrics derived from the data." The Occupational Summary further specified that the "DM/BI is a critical resource" created from varying data sources, including the SMO, and "used by the OBH Business Intelligence section to manage and evaluate the SMO and to monitor and evaluate the statewide network of behavioral health services and providers." Mrs. Barnett conceded she signed the second Position Description on October 31, 2012, but contested the contents of the Occupational Summary.

*La. Board of Ethics in the Matter of Barnett*, 23-321, p. 8-9 (La. 1/26/24), 383 So. 3d 1010, 1017-18.

She also testified that "throughout the eighteen months before" she signed the "DHH-OBH Confidentiality and Conflict of Interest Statement for Development and Drafting of RFP" on October 11, 2013, she inquired with "all the executive management team" as to whether her husband working at Magellan would be a conflict. Mrs. Barnett stated she was consistently told there would be no problem and that, as a new employee coming from the private sector, she did not fully understand this process.

On December 20, 2022, the Ethics Adjudicatory Board ("EAB") issued its decision concluding that the Board of Ethics proved by clear and convincing evidence that Mrs. Barnett was a public servant who violated La. R.S. 42:1111(C)(2)(d) by receiving a thing of economic value for or in consideration of

6

services rendered to or for a person from whom she would be prohibited from receiving a gift under La. R.S. 42:1115(A)(1). As a penalty under La. R.S. 42:1155(A), the EAB ordered Mrs. Barnett to pay $22,053.74, the economic advantage of Mrs. Barnett's portion of her husband's salary during the relevant time period of March 1, 2013, through October 15, 2013.[10] The EAB also imposed a fine of $1,000 against Mrs. Barnett for violating La. R.S. 42:1111(C)(2)(d).

Pursuant to La. R.S. 42:1142(A)(1),[11] Mrs. Barnett appealed the EAB decision directly to the Court of Appeal, First Circuit. A majority of the court affirmed the EAB's ruling, also finding the BOE proved by clear and convincing evidence that Mrs. Barnett was a public servant who took a thing of value from a prohibited source by virtue of her receipt of one-half of her husband's salary, which was received for or in consideration of services rendered to a prohibited source. *La. Board of Ethics in the Matter of Barnett*, 23-321 (La. App. 1 Cir. 1/26/24), 383 So. 3d 1010. The court of appeal concluded that the plain language of La. R.S. 42:1111(C)(2) prohibits both the receipt of payments by a public servant and the receipt of payments by entities in which a public servant exercises control or has the requisite ownership interest. In other words, according to the court of appeal, "the prohibition applies to public servants in their individual capacity regardless of whether a legal entity is involved." *Id.* at 1020. The court of appeal also found that regardless of "any legal distinction between Magellan SMO and Magellan HRSC," an actual relationship

---

[10]The EAB found that the Board of Ethics did not prove the exact date in February, 2013, when Mrs. Barnett transitioned to her new position and, accordingly, the EAB considered the period for economic advantage to be from March 1, 2013, through October 15, 2013.

[11]La. R.S. 42:1142(A)(1) provides:

> (A)(1) Whenever action is taken against any public servant or person by order of the Board of Ethics, or panel thereof, or by a final decision of the Ethics Adjudicatory Board, or by an agency head by order of the Board of Ethics, or panel thereof, or by a final decision of the Ethics Adjudicatory Board, or whenever any public servant or person is aggrieved by any action taken by the Board of Ethics, or panel thereof, or the Ethics Adjudicatory Board, he may appeal to the Court of Appeal, First Circuit.

existed between the two entities, and the evidence established that Mr. Barnett provided services in furtherance of Magellan's contract with the Office of Behavioral Health. *Id.* at 1023. The court concluded that notwithstanding whether Mr. Barnett's services and/or his salary passed through another entity, his salary was paid for or in consideration of services rendered to Magellan, in its capacity as the SMO (the prohibited source). Consequently, the court of appeal concluded that the penalty ordered under La. R.S. 42:1155(A) that Mrs. Barnett pay the economic advantage of $22,053.74 (for the period of time from March 1, 2013, through October 15, 2013) and a fine of $1,000 were not in error. Declining to entertain Mrs. Barnett's argument that the EAB admitted inadmissible and unauthenticated documents, the court of appeal found that even if it were to discount the alleged defective exhibits, Mr. and Mrs. Barnett's testimonies alone are sufficient to uphold the EAB's finding in this matter. *Id.* at 1025.

Judge Miller dissented, noting initially that he would utilize the manifest error standard of review, as the provisions of La. R.S. 42:1142 mandate judicial review directly to the court of appeal, thereby bypassing the district court level of review. Judge Miller further found that while Mrs. Barnett improperly received something of economic value in the salary received by her community from the prohibited source, he did not find sufficient proof to show that the receipt of this thing was due to the services rendered *by the public servant*, as he concluded that the statute did not define "public servant" broadly to include family members. *Id.* at 1027 (emphasis added), citing La. R.S. 42:1102(19). Finally, Judge Miller noted that under the rule of lenity, when there is doubt as to the interpretation of a penal statute, it should be resolved in favor of the person subject to the fine or penalty. *Ellis v. La. Board of Ethics*, 14-1112 (La. App. 1 Cir. 12/30/14), 168 So. 3d 714, 724.

8

This Court thereafter granted Mrs. Barnett's writ application. *La. Board of Ethics in the Matter of Michelle Barnett*, 24-500 (La. 6/25/24), 386 So. 3d 1076 (mem.).

**DISCUSSION**

The Louisiana Administrative Procedure Act ("APA") governs judicial review of EAB opinions. *Barnett, supra, citing* La. R.S. 42:1143; La. R.S. 49:950 *et seq.* The APA specifies that judicial review shall be confined to the record, as developed in the administrative proceedings. La. R.S. 49:978.1(F). It is well established that the decision of the EAB may only be reversed or modified if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion; or (6) not supported and sustainable by a preponderance of the evidence. La. R.S. 49:978.1(G). *See generally, Louisiana Board of Ethics in the Matter of Donald Villere*, 15-1939, p. 7 (La. App. 1 Cir. 12/22/16), 208 So. 3d 940, 945, citing *La. Bd. of Ethics in re Great Southern Dredging, Inc.*, 15–0870 (La. App. 1 Cir. 5/27/16), 195 So.3d 631, 634. However, this Court owes no deference to the legal findings of the EAB; rather, we review questions of law *de novo* and render a judgment based on the record before us. *See City of New Orleans v. Clark*, 17-1453 (La. 9/7/18), 251 So. 3d 1047.

The Louisiana Board of Ethics is established by Title 42, Section 1132 of the Revised Statutes and is charged with enforcing the Louisiana Code of Ethics. *See* La. R.S. 42:1132.[12] The Code of Ethics was created to "further the public interest

---

[12]By virtue of Act 591 of the 2024 Regular Session of the Louisiana Legislature, La. R.S. 42:1132 was revised to increase the number of members on the board from eleven to fifteen, with nine of those members appointed by the governor, three elected by the House of Representatives, and three

9

by insuring that the law protects against conflicts of interest on the part of Louisiana's public officials and state employees by establishing ethical standards to regulate the conduct of these persons" without creating unnecessary barriers to public service. *Duplantis v. La. Board of Ethics*, 00-1750, 00-1956, p. 6 (La. 3/23/01), 782 So. 2d 582, 586; La. R.S 42:1101.[13] The Board's powers, duties and responsibilities to investigate and pursue formal charges through either public or private hearings against an individual or entity for alleged violations of the Code of Ethics are defined in La. R.S. 42:1134.

Pursuant to La. R.S. 42:1141.5, the EAB, which consist of randomly selected administrative law judges, conducts hearings related to the charges brought by the Board, after which the panel shall determine whether a violation of any provision of law within the jurisdiction of the Board of Ethics has occurred. If the panel determines that a violation has occurred, it shall determine the appropriate penalties or other sanctions, if any, to be imposed. La. R.S. 41:1141.5. The charges against the public servant must be proven by "clear and convincing evidence." La. R.S. 41:1141.5(C). *See also*, *State of La. in the Interest of A.L.D. and L.S.D.*, 18-1271,

---

elected by the Senate. The term of office for the four additional members of the Board of Ethics provided for in this revision shall begin on January 1, 2025.

[13]La. R.S. 42:1101 provides:

> A. Whereas the people of the state of Louisiana have in Article X, Section 21 of the Louisiana Constitution mandated that the legislature enact a code of ethics for officials and employees of this state and its political subdivisions, the legislature does hereby enact a Code of Governmental Ethics.
>
> B. It is essential to the proper operation of democratic government that elected officials and public employees be independent and impartial; that governmental decisions and policy be made in the proper channel of the governmental structure; that public office and employment not be used for private gain other than the remuneration provided by law; and that there be public confidence in the integrity of government. The attainment of one or more of these ends is impaired when a conflict exists between the private interests of an elected official or a public employee and his duties as such. The public interest, therefore, requires that the law protect against such conflicts of interest and that it establish appropriate ethical standards with respect to the conduct of elected officials and public employees without creating unnecessary barriers to public service. It is the purpose of this Chapter to implement these policies and objectives.

p. 4-5 (La. 1/30/19), 263 So. 3d 860 (internal citations omitted) ("'Clear and convincing' evidence requires more than a 'preponderance,' but less than 'beyond a reasonable doubt.' Under the 'clear and convincing' standard, the existence of the disputed fact must be highly probable or much more probable than its nonexistence.'").

As discussed above, the Board of Ethics asserts that Mrs. Barnett violated La. R.S. 42:1111(C)(2)(d) by virtue of her receipt of compensation through her husband's rendering of services to Magellan, while Magellan had a contractual, business, or other financial relationship with Mrs. Barnett's agency from July 2012 until August 25, 2014. In order to find Mrs. Barnett violated La. R.S. 42:1111(C)(2)(d) as charged, it must be established by clear and convincing evidence that (1) Mrs. Barnett was a public servant; (2) Mrs. Barnett received a thing of economic value, and (3) the thing of economic value was for or in consideration of services rendered to a person considered a prohibited source as defined in La. R.S. 42:1115 (the prohibited gifts statute).[14] As to the first requirement, we agree with the court of appeal and the EAB that Mrs. Barnett, as an employee of the Office of Behavioral Health, was a "public servant" as defined in La. R.S. 42:1102(19)

---

[14]La. R.S. 42:1115 provides:

> A. No public servant shall solicit or accept, directly or indirectly, any thing of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public servant knows or reasonably should know that such person:
>> (1) Has or is seeking to obtain contractual or other business or financial relationships with the public servant's agency, or
>> (2) Is seeking, for compensation, to influence the passage or defeat of legislation by the public servant's agency.
> B. No public employee shall solicit or accept, directly or indirectly, anything of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public employee knows or reasonably should know that such person:
>> (1) Conducts operations or activities which are regulated by the public employee's agency.
>> (2) Has substantial economic interests which may be substantially affected by the performance or nonperformance of the public employee's official duty.

11

("'Public servant' means a public employee or an elected official."). However, we do not find clear and convincing evidence that Mrs. Barnett received a thing of economic value for or in consideration of services rendered to a person considered a prohibited source. Thus, the Board failed to prove either the second or third requirements for establishing the charged violation of La. R.S. 42:1111(C).

The statute at the time of the alleged violation stated that "[n]o **public servant and no legal entity** in which the public servant exercises control or owns an interest in excess of twenty-five percent shall receive any thing of economic value for or in consideration of services rendered. . .to or for any person during his public service unless such services are . . . . [n]either performed for nor compensated by any person from whom such public servant would be prohibited by La. R.S. 42:1115(A)(1) or (B) from receiving a gift."[15] La. R.S. 42:1111(C)(2)(d) (emphasis added). The record establishes that Mrs. Barnett, as the public servant charged herein who

---

[15]The statute was amended Acts 2021, No. 272, § 1, eff. June 15, 2021 to add (5) to La. R.S. 42:1111(C). It provides:

> (5)(a) Notwithstanding the provisions of Subparagraph (2)(d) of this Subsection, the spouse of a public servant may continue employment with a person who has or is seeking a contractual or other business or financial relationship with the public servant's agency provided all of the following conditions are met:
> > (i) The spouse is a salaried or wage-earning employee and has been continuously employed by the person for at least one year prior to the date the compensated employment would have otherwise initially been prohibited.
> > (ii) The compensation of the spouse is substantially unaffected by a contractual or other business or financial relationship with the public servant's agency.
> > (iii) Neither the public servant nor the spouse is an owner, officer, director, trustee, or partner in the legal entity which has or is seeking to have the relationship with the public servant's agency.
> > (iv) The public servant recuses or disqualifies himself from participating in any transaction involving the spouse's employer in accordance with R.S. 42:1112 and related rules and regulations.
> > (v) Either prior to or within ten business days of the date the compensated employment would otherwise be prohibited, the spouse and the public servant jointly file with the Board of Ethics a written notice containing a brief description of the nature of the contractual, business, or financial relationship with the public servant's agency, the date the spouse was employed by the person, and any other information required by the board.
> > (vi) The spouse complies with the disclosure requirements in R.S. 42:1114.
> (b) The provisions of this Paragraph shall not apply to members of the legislature.

12

worked for OBH/DHH, did not render services for a prohibited source. Rather, Mrs. Barnett's husband, who was not a public servant, rendered services to a company that may or may not have been the SMO.

It should be noted that there is and remains much confusion in the record regarding which entity for which Mr. Barnett specifically worked. Although Mr. Barnett states he worked for a company called "Magellan," he realized at some point that his W-2 forms were issued by Magellan HRSC, Inc. Furthermore, he also identified "Magellan Health Services" as his employer on his Financial Disclosure Statements but testified he was told he did "not work for the SMO." In fact, the record reveals that during closing arguments, the Board of Ethics encouraged the Ethics Adjudicatory Board to "Google" whether any relationship between Magellan HRSC and the SMO Magellan existed.[16] Although the court of appeal found that notwithstanding any "legal distinction" that may exist between Magellan SMO and Magellan HRSC, "an actual relationship existed between the two entities, and Mr. Barnett provided services in furtherance of Magellan's contract with OBH." *Louisiana Board of Ethics in the Matter of Michell Barnett*, 23-321, p. 16 (La. 1st Cir. 1/26/24), 383 So. 3d 1010, 1023. We disagree. We do not find the Board of Ethics sufficiently carried its burden of proof to show that Mr. Barnett worked for the prohibited SMO.

Nor did the Ethics Board establish by clear and convincing evidence that any legal entity in which Mrs. Barnett "exercises control or owns an interest in excess of twenty-five percent" received compensation for services rendered to a prohibited source. To conclude that services rendered and compensation received by the public servant's spouse could lead to a violation of La. R.S. 42:1111(C)(2)(d) constitutes an improper expansion of the definition of "public servant" under the statute. The

---

[16]Respondent's counsel objected to this suggestion and the Panel sustained the objection, noting that they do not "engage in Google searches because that's . . . . an investigative function" and "not an administrative hearing function."

definition of "public servant," particularly at the time of this alleged violation, has not been expanded to include spouse. *See* La. R.S. 42:1102(19) ("'[p]ublic servant' means a public employee or elected official."). We similarly decline to do so under the facts of this case.

The court of appeal improperly concluded that Mrs. Barnett received a thing of economic value because she received one-half of Mr. Barnett's salary by virtue of the community property regime created by Mr. and Mrs. Barnett's marriage. It is well settled that the relationship of marriage is not a legal entity. *See* La. C.C. art. 86 ("Marriage is a legal relationship between a man and a woman that is created by civil contract. The relationship and the contract are subject to special rules prescribed by law."); *id.,* cmt. (d) ("The relationship of marriage is not a legal entity . . . ."). Thus, the community property regime created by Mrs. Barnett's marriage is not a "legal entity" for purposes of any violation of La. R.S. 42:1111(C)(2). While the court of appeal did not specifically hold that the community property regime constituted a legal entity under La. R.S. 42:1111(C)(2), its ruling that Mrs. Barnett's undivided ownership in one-half of Mr. Barnett's compensation during the existence of their marriage constituted receipt of a thing of economic value (one-half of Mr. Barnett's salary) implies a finding that while the public servant (Mrs. Barnett) did not directly receive the thing of economic value, the "legal entity" in which the public servant exercises more than 25% control (her community property regime) did. *See* La. R.S. 42:1111(C)(2) ("[n]o public servant and no legal entity in which the public servant exercises control or owns an interest in excess of twenty-five percent, shall receive a thing of economic value. . . "). This ruling was in error.

We find the Board of Ethics failed to prove by clear and convincing evidence that Mrs. Barnett as the public servant directly received any thing of economic value in violation of the statute, and the Ethics Adjudicatory Board and court of appeal erred in otherwise finding a violation of La. R.S. 42:1111(C)(2) through the "legal

14

entity" of her community property regime.[17] The EAB and court of appeal's legal analyses run afoul of our settled principles of statutory interpretation, which begins with the language of the statute itself, as the text of the law is the best evidence of legislative intent. *See* La. R.S. 24:177(B)(1); *Rando v. Anco Insulations, Inc.*, 08-1163 (La. 5/22/09), 16 So. 3d 1065, 1075. As this Court has stated, "[u]nequivocal statutory provisions are not subject to judicial construction and should be applied giving words their generally understood meaning." *Boudreaux v. Louisiana Dept. of Public Safety and Corrections,* 12-239, p. 5 (La. 10/16/12), 101 So. 3d 22, 26, citing La. C.C. art. 11; La. R.S. 1:3; and *Snowton v. Sewerage and Water Bd.*, 08–0399, pp. 5–6 (La.3/17/09), 6 So.3d 164, 168.[18]

## CONCLUSION

The Ethics Board failed to satisfy its burden of proof to show Mrs. Barnett violated La. R.S. 42:1111(C) by accepting a thing of economic value for services rendered to a prohibited source. We therefore reverse the ruling of the court of appeal, vacate the decision of the Ethics Adjudicatory Board and dismiss all charges

---

[17]The court of appeal in this matter erroneously relied upon *Louisiana Board of Ethics in the Matter of Great Southern Dredging, Inc.*, 15-870 (La. App. 1 Cir. 5/27/16), 195 So. 3d 631, in reaching this conclusion. We find that case factually distinguishable because its primary focus was on the public servant's wife's majority stock ownership in the actual legal entity (a towing company) subcontracted with a party to the contract with the public servant's agency. Here, neither Mrs. Barnett or Mr. Barnett had any ownership in a legal entity that received a thing of economic value from a prohibited source for purposes of La. R.S. 42:1111(C)(2).

[18]The statutes under which the EAB imposed the fines and penalties against Mrs. Barnett, La. R.S. 42:1153(B) and La. R.S. 42:1155(A), are penal in nature and "[s]tatutes which authorize the imposition of a penalty are to be strictly construed." *Barry Hornsby v. Bayou Jack Logging, et al.*, 04-1297, p. 12 (La. 5/6/05), 902 So. 2d 361, 369. *See also, Oubre v. Louisiana Citizens Fair Plan*, 11-97, p. 12-13 (La. 12/16/11), 79 So. 3d 987, 997 ("[s]tatutes that are penal in nature must be strictly construed."). The rule of lenity requires that courts should not construe penal statutes as extending powers not authorized by the letter of the law even if such powers are arguably within its spirit. *Ellis v. La. Board of Ethics*, 14-112 (La. App. 1 Cir. 12/30/14), 168 So. 3d 713, *writ denied*, 15-0208 (La. 4/17/15). The rule of lenity, which has been applied in the area of administrative law, also requires that "where there is any doubt as to the interpretation of a statute upon which a prosecution is based, doubt must be resolved in favor of the accused." *Id*. at 724, citing *Doe v. Louisiana Bd. of Ethics*, 12–1169 (La. App. 4th Cir.3/13/13), 112 So.3d 339, 346–47, *writ denied*, 13–0782 (La.8/30/13), 120 So.3d 265. Although we do not find that the Board of Ethics sufficiently established that Mrs. Barnett received a thing of economic value for services rendered to a prohibited source based upon a strict construction of La. R.S. 42:1111(C), even assuming any ambiguity in the statute's interpretation, the rule of lenity would require this Court to construe the statute in favor of Mrs. Barnett, thereby dismissing the charges against her, and vacating the order of penalty and fine.

against Mrs. Barnett, including the $22,053.74 penalty and $1,000 fine assessed against her.

**REVERSED.**